# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1090-16T3

J.A.C.,

    Plaintiff-Respondent,

v.

C.A.C.,[1]

    Defendant-Appellant.

_____

Submitted January 10, 2018 – Decided March 4, 2019

Before Judges Fuentes and Koblitz.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FV-12-0317-17.

The Tormey Law Firm, LLC, attorneys for appellant (Thomas Ercolano, III, on the brief).

J.A.C., respondent pro se.

---

[1] We use initials to identify the parties to protect their privacy. R. 1:38-3(d)(9).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

This appeal concerns the validity of a Final Restraining Order (FRO) issued by the Family Part under the Prevention of Domestic Violence Act, (PDVA), N.J.S.A. 2C:25-17 to -35, against defendant C.A.C., plaintiff J.A.C.'s former husband. The parties resided in California while married and had two children, a girl age fifteen years old and a boy who is now eleven years old. They divorced in 2010. Plaintiff thereafter relocated to New Jersey with the children. Defendant remained in California, remarried, and has a three-year-old daughter with his current wife.

The incident that gave rise to plaintiff seeking relief under the PDVA occurred on August 9, 2016, when the parties' then nine-year-old son was vacationing with his father in California pursuant to the parenting time schedule approved by the court as part of the final judgment of divorce. The parties began exchanging text messages about their son on August 9, 2016 at approximately 10:00 p.m., Eastern Standard Time. Plaintiff testified she told defendant to stop texting her at 11:00 p.m., which was eight o'clock in the evening in California. Although defendant did not heed this time restriction, the judge found plaintiff did not become aware of these text messages from defendant until eleven o'clock

the next morning. Furthermore, without making any findings as to the content of defendant's text messages, the judge concluded defendant harassed plaintiff under N.J.S.A. 2C:33-4, by "continuing to [send] those messages . . . because the only purpose that could be deemed to have occurred was with the purpose to harass. There was no longer a[n] . . . ongoing discussion about the child, but rather back and forth between . . . the parties."

Based on the evidence presented at the FRO hearing and mindful of our standard of review, we reverse.

I

The PDVA complaint plaintiff filed on August 10, 2016, that formed the basis for the issuance of a temporary restraining order against defendant, described the predicate act of domestic violence as follows:

> The plaintiff states the defendant harassed her by sending her an excessive number of text messages[.] The plaintiff wanted to know where her son was, as he is currently visiting the defendant in California. The plaintiff asked him to stop texting her at 11:17 pm and he sent 7 more text messages after that until about 2 am EST. The defendant stated on one of the text messages he will contact the plaintiff's place of employment and place a complaint. The plaintiff took that statement as a threat. The plaintiff is afraid of the defendant.

A-1090-16T3

Plaintiff appeared at the FRO hearing pro se. Defendant was represented by private counsel. Before hearing her testimony, the judge addressed plaintiff directly and explained to her that she would be the first person to testify and to "tell me the reasons why a final restraining order should be issued. After you finish testifying, the defendant's attorney will have an opportunity to ask you questions regarding your testimony."

In lieu of asking plaintiff questions based on the allegations she made in her domestic violence complaint, the judge allowed plaintiff to testify in a narrative style. Defendant's counsel did not object. The judge thus simply asked plaintiff: "Tell me what happened." In response, plaintiff engaged in a stream of consciousness, uninterrupted account of her tumultuous relationship with defendant that covered nine transcription pages. In the course of this freewheeling testimony, plaintiff mentioned defendant's text message allegedly threatening her job only once. She provided the following account of its content:

> And . . . he continued to text [me] til like 2:00 in the morning when I'm asleep. And then the worst part is the whole texting was that he threatened to call my employer to tell me that they should check into my internet usage because I stalk him. Whichever - - whatever that means I don't know.
>
> I don't know what I could be stalking or what internet usage he could be, you know, monitoring. So, it just - - the years of the - - harassing comments [.]

4

Plaintiff did not produce a printed copy of this text message or any of the other text messages defendant allegedly sent her in the early morning hours of August 10, 2016. Plaintiff acknowledged, however, that the text messages did not wake her up because she had her cellphone on "vibrate."

On cross-examination by defense counsel, plaintiff testified that earlier on August 9, 2016, she called defendant in California to talk to her son, who was then on vacation with his father. Plaintiff conceded that defendant told her the boy was asleep because he was tired from swimming. However, when counsel asked her if defendant told her that the boy would call her back when he woke up, plaintiff stated: "I don't know if that was the case. So I can't say yes or no." After a brief contentious exchange with defense counsel about whether the child awoke by himself or was awoken by defendant, plaintiff conceded the boy was able to speak to her on the phone. This prompted the following testimony:

Q. And you spoke with him?

A. Correct.

. . . .

Q. He has just woke up, correct?

A. Yeah.

Q. But, then you believed that perhaps he was drugged
and you called the police?

A. That is not why, no.

Q. You called the police - -

A. That was way - -

Q. - - after you spoke with him?

A. - - prior to that. That was when he refused to tell me where my son was. And I'm 2,500 miles away. And any mother should be concerned when their exhusband who has their child. Their ten year old, refuses to share such vital information.

. . . .

. . . [H]e finally told me after the police had been called.

Q. But, he did tell you eventually where he had been.

A. At 10:47 p.m., correct.[2]

Plaintiff also conceded that "about a week later" the child sent her a photograph showing defendant had taken him to "Medieval Times" as a belated birthday celebration because defendant did not have parenting-time during his son's actual birthdate. Plaintiff also called her mother as a witness. However, her testimony was not relevant to the allegations plaintiff identified as predicate acts of harassment by defendant in the PDVA complaint.

---

[2] This was Eastern Standard Time. Thus, it was 7:47 p.m. in California.

A-1090-16T3

Defendant testified in his own defense. Directing his client's attention to plaintiff's testimony alleging that he told her he was going to contact her employer, Rutgers University, defense counsel asked defendant: "Why did you say that?" Defendant explained that as a real estate agent, he had set up a website to advertise his services. One of the features of the website allows him to monitor his internet traffic or "visitor stats." This also allows him to determine what pages of the website generate more visitors and how much time each visitor spends on each page. This information enables him to adjust the webpages to target the visitors' interests and "gain more business."

Defendant also explained that this feature also allowed him to see the visitors' "server name or IP address." Through this process, defendant testified he noticed a particular server name or IP address "repeatedly checking" his website. Defendant testified that an IP address from Rutgers checked his website ninety-four times. When defense counsel completed defendant's direct testimony, the judge asked plaintiff if she had any questions of the witness. Plaintiff asked the following question:

> [W]hy is [defendant bringing up] . . . an incident that
> happened in May of 2011? What pertinence does that
> have on the current situation that he should threaten to
> call my employer and potentially get me fired from
> my job? I have the proof. I can actually show you.

THE COURT: What's your question?

PLAINTIFF: Why - - is he bringing in something from 2011 and making it pertin - -

THE COURT: What's - - what's 2011?

PLAINTIFF: That's when this - - this apparent situation happened.

         . . . .

THE COURT: [Addressing defendant] Okay. The month that you're talking about was that recently or was that in 2011?

DEFENDANT: It was in 2011, Your Honor.

THE COURT: Okay. Next question.

PLAINTIFF: That's all I have to say.

In his summation, defense counsel argued plaintiff did not prove, by a preponderance of the evidence, that defendant sent the seven text messages with an intent to harass. Counsel claimed the record reflects "[t]here was a back and forth conversation via text message." The seven text messages that formed the basis for the harassment charge "were sent as part of that whole conversation." Counsel also argued plaintiff did not prove defendant sent these seven texts "deliberately to wake the plaintiff up." According to defense counsel, the record merely reflected the parties were "unfortunately . . . part of [a] contentious

A-1090-16T3

divorce, engaged . . . [in] not . . . the most admirable conduct . . . [.] But it certainly does not rise to a level of harassment under the criminal code." Finally, even assuming defendant's seven text messages constituted harassment, defense counsel argued there was no basis to find a restraining order is warranted to protect plaintiff from further abuse by defendant under the second prong in Silver v. Silver, 387 N.J. Super. 112, 127 (App. Div. 2006).

Against this backdrop, the judge made the following findings in support of his decision to issue an FRO against defendant:

> The defendant continued to send another series of text messages totaling seven between 11:00 o'clock in the evening on August 9th, until approximately 2:00 o'clock in the morning on August 10th.
>
> The plaintiff testified candidly that - - that she did not want to carry on the conversation via text. She also indicated that she was annoyed and alarmed by those continuing text messages being received by the - - by the defendant.
>
> So, I do find that the - - his continuing to make those messages was in fact an act of harassment because the only purpose that could be deemed to have occurred was with the purpose to harass. There was no longer a - - a discussion - - ongoing discussion about the child, but rather, back and forth between - - between the parties.

II

9

We grant substantial deference to the factual findings made by a Family Part judge following a trial in a domestic violence matter, especially findings that are based on the judge's assessment of the credibility of a witness's testimony. Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). This deference is rooted in the common sense notion that the trial judge "hears the case, sees and observes the witnesses, [and] hears them testify, [affording the judge] a better perspective than a reviewing court in evaluating the veracity of witnesses." Cesare, 154 N.J. at 412 (quoting Pascale v. Pascale, 113 N.J. 20, 33 (1988)). We will not disturb the "factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice . . . ." Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974) (quoting Fagliarone v. Twp. of N. Bergen, 78 N.J. Super 154, 155 (App. Div. 1963)).

The PDVA complaint plaintiff filed against defendant on August 10, 2016 listed eighteen[3] different offenses that constitute a predicate act of domestic

---

[3] Effective January 17, 2014, the Legislature created the crime of cyber-harassment, N.J.S.A. 2C:33-4.1. The Legislature also amended N.J.S.A. 2C:25-19 to include cyber-harassment as the nineteenth predicate act of domesticate violence. Defendant was not charged with this offense.

violence under N.J.S.A. 2C:25-19. Based on plaintiff's description of defendant's conduct, the Family Part staff who prepared the complaint checked "harassment" as the relevant predicate act here. N.J.S.A. 2C:33-4 defines the petty disorderly offense of harassment as follows:

> [A] person commits a petty disorderly persons offense if, with purpose to harass another, he:
>
> a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

Our Supreme Court has noted that:

> harassment is the predicate offense that presents the greatest challenges to our courts as they strive to apply the underlying criminal statute that defines the offense to the realm of domestic discord. Drawing the line between acts that constitute harassment for purposes of issuing a domestic violence restraining order and those that fall instead into the category of "ordinary domestic contretemps" presents our courts with a weighty responsibility and confounds our ability to fix clear rules of application.

11

[J.D. v. M.D.F., 207 N.J. 458, 475 (2011) (citation omitted).]

Here, the facts show that since their divorce, the parties have been unable to communicate in an amicable fashion about matters related to their children. Both parties have adopted a highly combative, emotionally charged position when they interact as parents, presuming the other has acted or will act in bad faith. This hostility has affected their judgement to such an extent that facially innocuous events are transformed into plots to undermine the other parent's relationship with their children.

The trial judge's findings did not properly account for the parties' acrimony. The judge found defendant committed the predicate act of harassment when he "continued to send another series of text messages totaling seven between 11:00 o'clock in the evening on August 9, [2016] until approximately 2:00 o'clock in the morning on August 10, [2016]." However, plaintiff did not become aware of the existence of these text messages until she woke up on the morning of August 10, 2016. Despite this, the judge concluded that defendant's decision to continue to text plaintiff constituted harassment "because the only purpose that could be deemed to have occurred was with the purpose to harass."

N.J.S.A. 2C:33-4(a) defines harassment as "a communication or communications anonymously or at extremely inconvenient hours, or in

offensively coarse language, or <u>any other manner likely to cause annoyance or alarm</u>." (Emphasis added). The facts here do not support the judge's inference that defendant sent these text messages with the purpose to harass plaintiff. The record does not disclose, and the judge did not make any findings about the content of these seven text messages. In <u>L.M.F. v. J.A.F., Jr.</u>, 421 N.J. Super. 523, 535 (App. Div. 2011), this court addressed a case in which the defendant sent the plaintiff, his former wife, "eighteen text messages inquiring about their daughter's SAT scores." The judge granted the plaintiff's application for an FRO because the defendant sent "text messages to [the plaintiff] about something that did not need to be addressed at 6:50 a.m., but [the defendant] felt that need to do so . . . most importantly, that [the defendant] committed an act of harassment because he communicated with her in a manner that was likely to cause annoyance." <u>Id.</u> at 532.

In reversing the Family Part's decision and vacating the FRO in <u>L.M.F. v. J.A.F., Jr.</u>, we noted the inherent risk of mischaracterizing post-marital contretemps as predicate acts of domestic violence in our technological age:

> The facts presented here exemplify the complexity of human interactions and the strain they place on Family Part judges as they struggle to distinguish between the cases that merit judicial intervention and those that do not. We conclude the evidence presented here shows only the convergence of modern technology and the

13

foibles of human judgment. Our ability to instantaneously and effortlessly send electronic messages has created a gateway unfettered by reflection and open to rash, emotionally driven decisions. The ease and speed by which we transmit electronic messages has also created a commensurate expectation of an equally instantaneous response from the recipient.

Despite their decision to terminate their marriage, and in defendant's case to remarry, the parties' relationship as parents will never end. In an implicit recognition of this reality, the parties used texting as the primary means of communicating with each other concerning the welfare of their children. Both sides agreed that over the four years preceding this litigation, the subject matter of their text messages was always the children.

Given the emotional tension that seems to have remained following the divorce, texting provided an efficient means of exchanging information as parents, while avoiding the personal contact associated with a telephone call or a face-to-face encounter. The limited number of words that can be sent at any one time in a text message also minimized the risk for extraneous matters to interfere with the primary dialogue of parenting. Despite these qualities, texting is merely a tool, a means to an end. Without reasonable cooperation, texting can lead to the frustration and misuse we witness here.

[Id. at 534-35.]

The facts here are nearly identical to the salient facts that drove our analysis in L.M.F. v. J.A.F., Jr.. Here, however, there is far less evidence to

support a finding of harassment under N.J.S.A. 2C:33-4(a).  The record here does not disclose the content of the seven text messages defendant sent plaintiff.  Furthermore, since defendant resides in California, it is highly unlikely he will have any direct physical contact with plaintiff.  Plaintiff's nebulous testimony about defendant's alleged threat to report her unauthorized use of her work computer to her employer does not implicate the public policy concerns identified by the Legislature in the PDVA, N.J.S.A. 2C:25-18.  Defendant did not introduce into evidence the actual text message nor read its content verbatim into the record.  The constitutionality of the offense of harassment in a written message is predicated on the intent of the sender.  As our Supreme Court recently reaffirmed:

> In cases based on pure expressive activity, the amorphous terms "alarming conduct" and "acts with purpose to alarm or seriously annoy" must be defined in more concrete terms consonant with the dictates of the free-speech clauses of our Federal and State Constitutions.  Narrowly reading the terms alarm and annoy—as we have done in past cases involving subsection (a) of N.J.S.A. 2C:33-4—will save the statute from constitutional infirmity.
>
> [State v. Burkert, 231 N.J. 257, 284 (2017) (citation omitted).]

Without knowing the actual words defendant wrote, there is insufficient evidence to infer an intent to harass.  Finally, even if plaintiff had proven the

15

predicate offense of harassment, there is no evidence that a final restraining order is necessary to prevent future abuse. <u>Silver</u>, 387 N.J. Super. at 126-27. As the Court noted in <u>J.D.</u>:

> Although evidence offered by a putative victim may therefore suffice to meet the definition of harassment, courts must be careful not to overlook the statutory requirement that there be a finding that "relief is necessary to prevent further abuse." Merely concluding that plaintiff has described acts that qualify as harassment and omitting this added inquiry opens the door to potential abuse of the important purposes that the Act is designed to serve and threatens to "trivialize the plight of true victims, in the process."
>
> [<u>J.D.</u>, 207 N.J. at 476 (citations omitted).]

Reversed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1090-16T3