**RECORD IMPOUNDED**

*NOT FOR PUBLICATION WITHOUT THE*
*APPROVAL OF THE APPELLATE DIVISION*

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3608-19

M.M.,

    Plaintiff-Respondent,

v.

J.M.,

    Defendant-Appellant.

_____

Submitted February 23, 2021 – Decided May 7, 2021

Before Judges Fisher and Gummer.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FV-07-2929-20.

Paul A. Clark, attorney for appellant.

Donahue, Hagan, Klein & Weisberg, LLC, attorneys for respondent (Luther Griffin Jones, IV, of counsel and on the briefs).

PER CURIAM

Defendant appeals an initial temporary restraining order (TRO), an amended TRO, a final restraining order (FRO), and amended FROs entered under the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35 (PDVA), arguing, among other things, the trial court erred in finding plaintiff had proven the predicate act of harassment.[1]  Because the court's decision was supported by substantial, credible evidence, we affirm.

The parties are married and have two sons, who were eleven- and ten-years old at the time of the events forming the basis of this action, which began when plaintiff advised defendant she had tested positive for a sexually transmitted disease (STD).  She told defendant she believed he had "brought it in the house because I don't go anywhere" and "don't do anything to anyone" and because he had traveled overnight for work and had vacationed overseas without her knowledge.  She asked him to get tested and began sleeping in a guestroom because she did not want to sleep with someone whom she believed had given her an STD.

Three days later, early in the morning, defendant entered the guestroom where plaintiff was sleeping, took the blankets off her, and yelled at her,

---

[1]  We use initials to protect the identity of domestic-violence victims and to preserve the confidentiality of these proceedings.  R. 1:38-3(d)(12).

demanding proof of her positive test and his alleged travel. Defendant testified he had told plaintiff he would not leave the room until she showed him her test results. After plaintiff gave him the information he had requested, defendant asked her for more information, four to five times took the blankets off her as she put them back on, turned the lights on and off, and called her several names, including "bitch," "liar," and "whore." Plaintiff felt threatened and fearful.

Ten days later, while plaintiff was sleeping in the guestroom, defendant sent her several text messages. In one message, defendant told her:

> You have one more week or so to get back to the master bedroom or else don't be surprised if you are replaced by another woman on this bed who has respect for me, cares about my happiness, and does not threaten to call the cops on me ever. The woman will also know how to say I am sorry and thank you, the two things your mother did not teach you. I will need to see your lab papers . . . testing negative for [the STD] before I can sleep with you.

Defendant explained by "sleep" he meant "hav[e] sex."

He sent another long text that night, complaining about a friendship of plaintiff he viewed to be toxic, accusing her of "embarrassingly [having] left [the] marital bedroom," "saying [she had] no respect for [her] husband," and telling her "every time you plot against your husband you plot against yourself" and by "plotting to take their father to jail," she showed hatred for their children.

3

Testifying about his texts, defendant discussed his belief plaintiff had been "tracking something" against him and "must be up to no good" and of how the "marital bedroom is a sacred . . . place."

Five days later, defendant texted plaintiff the results of his STD test, which were negative. He believed with those test results "the reason she advanced for leaving the marital bedroom is no longer there." He wanted plaintiff to return to their bedroom "so the children see . . . everything is good. But then, obviously, in order to have sex." After he sent the test results, he asked her to return to their bedroom, telling her he had no intention of having sex with her and asking, "now what is your reason to not come back to the marital bedroom"?

The next day, because plaintiff refused to return to their bedroom, defendant came to the guestroom where plaintiff was sleeping, turned on the lights, and removed the door to the guest room. A few minutes later, he took the blankets off her and "started shaking the bed in the air." When she jumped off the bed, defendant told her she could not "sleep in the kids' bed because you are not my kids" and "you are not my roommate sleeping in this bedroom." He yelled at her and told her she was "stupid" and "crazy." Defendant testified he removed the door out of "[f]rustration." "She said go get tested, I go get tested.

A-3608-19

Show me the results, I show her the result.  She won't come to the bedroom."
He took the door down, believing as a result "she would come over."

Believing defendant would return to the guestroom if she stayed there, plaintiff went to her children's room, which had an air mattress from a prior sleep over.  After she had been sleeping on the air mattress, defendant came into the children's room and deflated the mattress.  When she tried to use a pump to reinflate the bed, defendant snatched it out of her hand.  Plaintiff slept in one of her son's beds that night.

The next day, when plaintiff was in the children's bedroom helping them get ready for bed, defendant came into the room and in a raised voice accused their eleven-year-old son of having sex with plaintiff, asked him "are you a motherfucker" and "have you ever had incest," said "wait until your cousins and your friends know . . . you're sleeping with your mom," and told him plaintiff would rape him while he was sleeping, frightening plaintiff and their son.

Three days later, when plaintiff was sleeping in the children's bedroom with the door locked, defendant early in the morning unlocked the door, came in, and pulled the blankets off plaintiff.  After she yelled at him to leave her alone, he left the room and began playing music, plaintiff believed with the intent to disturb her.  That evening, when she was sitting on the bed in her

5

children's room, defendant came into the room, told the children plaintiff was "taking away [their] rights" by sleeping in their bedroom, and stated he was going to kick plaintiff out of the bedroom. He grabbed and pulled the mattress she was using and took it to the parties' bedroom. According to plaintiff, she was on the mattress when defendant pulled it, causing her to fall and feel pain, and frightening her and the children, who ran from the room; defendant denied she was on the mattress but admitted he had moved the bed from the children's bedroom to the parties' bedroom. Plaintiff told defendant she had a right to have a place to sleep in the house. He told her she should sleep in their bedroom or otherwise in the car or garage. According to defendant, plaintiff attempted to move the mattress back to the children's room. Even though he recognized the situation was "starting to escalate again," defendant moved the mattress back to the parties' bedroom. The next morning, when one of their children told defendant his actions had made him physically sick, defendant blamed plaintiff, called her a "liar," told the children "I don't know what she's doing in your bedroom[;] she should not be there." With those statements, plaintiff started to shake, became "scared again," and decided to go to the police.

The same day, plaintiff filed a complaint and sought a temporary restraining order based on the predicate act of harassment, which she said had

6

occurred the previous day. Plaintiff alleged defendant had been "verbally harassing her because she [wouldn't] sleep in bed with him." She contended he "constantly yell[ed] at her," prevented her from sleeping by "making loud noises" and deflating the air mattress on which she had been sleeping, and called her "stupid, liar, bitch." The court issued a TRO, which did not address custody of the children.

On the scheduled FRO hearing day, plaintiff's counsel made an oral motion to amend the complaint because the TRO was "vague" as to "the predicate act" and "prior history." Plaintiff wanted to add assault as a predicate act. She testified as to the events forming the predicate act of harassment, the alleged assault, and the purported history of prior domestic-violence incidents. The court granted leave to amend the complaint to add the assault claim and the alleged prior acts. Defense counsel did not ask for custody or parenting time; she asked the court to direct plaintiff not to block defendant's calls to the children. The court issued a new TRO giving plaintiff "temporary custody" of the parties' children and denying defendant parenting time until further ordered. The court issued a schedule for defendant to call the children and directed plaintiff not to block his calls to them.

A-3608-19

The court conducted a two-day trial during which both parties testified. Plaintiff produced a video she had taken of the events of the evening before she filed the complaint, text messages she had received from defendant, and photographs of the door defendant had removed from the guestroom. Other than denying plaintiff was on the bed and had fallen when he moved it, defendant did not refute plaintiff's testimony. He testified his "goal was very clear. I invited her to the marital bedroom multiple times, which she refused and did what she wanted to do." He asserted, "everything I did, I was promoting the unity of the family."

After defendant testified, plaintiff's counsel moved for entry of an FRO. Citing N.J.S.A. 2C:12-1(a), counsel argued plaintiff had established a predicate act of assault based on defendant's testimony about pulling the mattress away from plaintiff. Citing N.J.S.A. 2C:33-4(a)-(c), counsel asserted plaintiff had established a predicate act of harassment, referencing defendant's removal of the guestroom door, which was done with the purpose of exerting physical control over plaintiff and coerce her to return to the parties' bedroom and his text messages.

The court held plaintiff had not proven assault given the parties' conflicting testimony. Finding defendant's "summary response" to be "he was

doing this to protect the unity of the family" and to "redirect" plaintiff's behavior, the court held plaintiff had proven harassment:

> The defendant's behavior, although his intention was to preserve the family unit, his behavior was controlling. It was designed in such a fashion to annoy her and force her back into the marital bedroom. He sent her messages, text messages saying if you don't come back there's going to be another woman -- I'm going to have another woman in the -- in the bed. I'll find another woman who will make me happy. . . .
>
> [T]he defendant says you have one more week to get back to the master bedroom or else don't be surprised if you are replaced by another woman. And this demonstrates, again, controlling behavior on the part of the defendant.
>
> There were other things that were done, the coming into the room, the taking of the mattress . . . . Even if it was just a matter of the air mattress, him taking the air mattress out of the room, he knew that she was sleeping on it. And the reason why he took the air mattress out, the reason why he deflated it, . . . was so that it would force her back into the bedroom.
>
> The conversation regarding because she won't sleep in the bed with him, if he's upset that she's not sleeping in the bed with him, he has the right to be upset with that, but he certainly does not have the right to engage in such controlling behavior.
>
> Domestic violence has been described and defined as a systematic pattern of controlling behavior perpetrated by one partner over the other. . . .

9

The defendant's behavior, and again by his own admission and his reasons as to . . . why he did the things he did. . . . [H]e said that he was doing it to protect the unity of the family. But if [by] protecting . . . the unity of the family he was controlling the behavior of the plaintiff, controlling her to go back to the bedroom, control her to do the things that he wanted her to do. He wanted her to do what he wanted her to do in order to preserve . . . what he wanted the family unity to be.

Phone calls, the bed, taking the door off, . . . coming into the children's room to see where parties were sleeping, coming in . . . with a flashlight. . . . I understand he had been doing it for the children, but, regardless, everything that he's done has been systematically done in order to direct her behavior . . . and preserve why he thinks . . . the family unity should be.

The court concluded plaintiff had established "the defendant's pattern and behavior" on the day before she filed the complaint "and going forward" was harassment and that defendant had "committed the domestic violence of harassment." The court also held based on defendant's testimony regarding how "he's going to do whatever he needs to do in order to preserve what he believes to be the unity of the family," a restraining order was necessary because "if a restraining order is not entered, the defendant will continue to do what he has done and may continue to do in order to preserve what he believes to be the unity of the family."

A-3608-19

The court granted plaintiff's request to submit a certification of services. The court raised the issue of defendant's contact with the children. Defense counsel stated she would contact plaintiff's counsel "to address those issues." Plaintiff's counsel agreed, advised the court the parties had filed divorce complaints, and suggested parenting time could be addressed in those matters. Defense counsel did not object. On May 13, 2020, the court issued an FRO, memorializing its findings and granting plaintiff temporary custody of the children. Defendant appealed the FRO.[2]

On June 1, 2020, the court conducted a conference to address a possible application by defendant to modify the FRO regarding parenting-time issues. The court found it could address issues regarding the children in this case because of some uncertainties concerning the parties' pleadings in their divorce matter. After hearing comments from counsel, the court noted neither counsel had raised an issue regarding arrangements for the children during the trial and the court had "rolled over the restraints" in place in the TRO into the FRO. With plaintiff's agreement, the court found defendant could have parenting time during dinner one night a week with the children, noting "a little more than that

---

[2] In a subsequent amended notice of appeal, defendant added to his appeal the TRO and amended TRO.

A-3608-19

can and should occur." The court also held defendant "should be able to have liberal discussion or liberal interactions" with the children by video or audio between 4:00 p.m. and 8:30 p.m. on school nights. The court was hesitant to order overnight visits because the court did not have information regarding defendant's housing arrangements. The court stated it would give the parties an opportunity to reach an agreement and bring them back for further discussion before it entered an amended FRO.

On June 5, 2020, the court issued an amended FRO, providing defendant with the parenting time the court had indicated during the conference plus parenting time overnight on two weekend days every other week and one weekend day on the weekends with no overnight stays. The court issued another amended FRO on June 8, 2020, "with corrections," omitting the award of temporary custody to plaintiff and maintaining the restraints and parenting-time schedule. Defendant filed an amended notice of appeal referencing the June FROs.

On November 16, 2020, the court issued an amended FRO, ordering defendant to pay plaintiff's attorney's fees. In a written opinion, the court stated the lawyer who had represented defendant at trial had opposed plaintiff's fee application on the bases the hourly rate was excessive and the number of hours

were inflated. The court indicated defendant's new counsel initially had argued the court did not have jurisdiction to address plaintiff's fee application, and defendant ultimately represented himself as to the fee application and chose not to appear at the hearing, having adopted the position the court had no jurisdiction. The court found it had jurisdiction over the fee application as a collateral matter, citing <u>Van Horn v. Van Horn</u>, 415 N.J. Super. 398 (App. Div. 2010). Holding plaintiff's counsel's hourly rate to be reasonable, the court granted $8,245 in attorney's fees, less than the requested amount of $9,590 because three hours were for administrative work more appropriately billed at a paralegal's rate and two hours were repetitive. We granted defendant's application to include this order in his appeal.

On appeal, defendant argues the trial court erred in finding harassment; granting "temporary" custody of an indefinite duration without considering statutory factors regarding custody of the children; suspending parental rights based on non-threatening name-calling; and awarding fees because it did not have jurisdiction due to defendant's pending appeal, included fees incurred in connection with the unsuccessful arguments, and failed to consider all "relevant" factors. Defendant also contends the harassment statute, N.J.S.A. 2C:33-4(a) and (c), is unconstitutional, arguing defendant has a constitutional right to call

plaintiff a "bitch" with no threat, and N.J.S.A. 2C:25-28 is unconstitutional because it authorizes a court to forbid a defendant in a domestic-violence matter from possessing a firearm or weapon based on name-calling.

Our review of a family judge's factual findings is limited. N.J. Div. of Child Prot. & Permanency v. J.B., 459 N.J. Super. 442, 450 (App. Div. 2019). We defer to a family judge's factual findings when supported by substantial, credible evidence in the record because the judge "has the superior ability to gauge the credibility of the witnesses who testify" and has "special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012); see also Cesare v. Cesare, 154 N.J. 394, 413 (1998). "We recognize that the cold record, which we review, can never adequately convey the actual happenings in a courtroom." Ibid. We intervene only when a trial judge's factual conclusions are "so wide of the mark" they are "clearly mistaken." N.J. Div. Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007). We review de novo a judge's legal conclusions. J.B., 459 N.J. Super. at 451.

We have identified harassment as "the most frequently reported predicate offense," L.M.F. v. J.A.F., Jr., 421 N.J. Super. 523, 533 (App. Div. 2011), in domestic-violence cases and as "[t]he most often cited potential misuse of the [PDVA]." A.M.C. v. P.B., 447 N.J. Super. 402, 417 (App. Div. 2016). We,

14

however, also have recognized, "[a]lthough a defendant might not use direct physical violence when he or she engages in the predicate act[] of harassment, . . . [harassment] can cause great emotional harm and psychological trauma." Ibid.

In N.J.S.A. 2C:33-4, harassment is defined in relevant part as follows:

> a person commits a petty disorderly persons offense if, with purpose to harass another, he: . . . .
>
> > c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

A violation of subsection (c) "requires proof of a course of conduct," which may "consist of conduct that is alarming" or "may be a series of repeated acts if done with the purpose 'to alarm or seriously annoy' the intended victim." J.D. v M.D.F., 207 N.J. 458, 478 (2011) (quoting N.J.S.A. 2C:33-4(c)); see also Peranio v. Peranio, 280 N.J. Super. 47, 55-56 (App. Div. 1995). The phrase "to alarm or seriously annoy" in subsection (c) means "to weary, worry, trouble, or offend." State v. Hoffman, 149 N.J. 564, 580-81 (1997); see also J.D., 207 N.J. at 478. A finding of harassment also "must be supported by some evidence that the actor's conscious object was to alarm or annoy." J.D., 207 N.J. at 487.

A-3608-19

"[T]he decision about whether a particular series of events rises to the level of harassment or not is fact-sensitive." Id. at 484.

Contrary to defendant's argument, we see no ambiguity in or lack of support for the court's finding defendant's behavior "was designed in such a fashion to annoy [plaintiff] and force her back into the marital bedroom." Some cases depend on circumstantial evidence from which a court may infer a defendant acted with the requisite state of mind to constitute harassment. See, e.g., C.M.F. v. R.G.F., 418 N.J. Super. 396, 404 (App. Div. 2011) (court infers defendant's intent to harass from "nature of the verbal attack, the manner of its delivery and the attendant circumstances"). Here, we have defendant's own testimony.

Plaintiff chose not to sleep in the parties' bedroom because she believed defendant had transmitted an STD to her. Defendant took repeated actions to compel her to return to their bedroom, including removing a door from a guestroom where she was sleeping, which he did with the express intent to cause her to "come over" to their bedroom; preventing her from sleeping on an air mattress in another room by deflating it and grabbing the pump from her when she tried to reinflate it; preventing her from sleeping on another mattress in the children's room by moving it to the parties' bedroom where he was sleeping;

 A-3608-19

sending her late-night texts threatening to replace her, and repeatedly demeaning plaintiff in the presence of their children, including questioning their eleven-year-old son about engaging in incest with plaintiff. The events described by the parties are "not ordinary domestic contretemps." Peranio, 280 N.J. Super. at 57. Instead, they constitute "a pattern of abusive and controlling behavior," id. at 52, with the stated intention of getting plaintiff back in defendant's bedroom. We see no error in the trial court's conclusion plaintiff proved domestic violence based on the predicate act of harassment.

In this appeal, defendant raises several issues he did not raise before the trial court, including issues regarding parenting-time, custody, the restraint against possession of a firearm and the purported unconstitutional application of N.J.S.A. 2C:33-4 and 2C:25-28 based on name calling. As we noted above, the only issue regarding the children defendant raised before the court issued the FRO was a request the court direct plaintiff not block his calls to the children, which the court granted. In issuing the FRO, the court, not defendant, raised the issue of defendant's contact with the children. Defendant's counsel stated she would contact plaintiff "to address those issues." The court also noted the procedure it would follow in light of the parties' filing of divorce complaints. The court subsequently amended the FRO to provide defendant with additional

parenting time. Defendant did not object to any of these procedures. The record contains no evidence defendant objected to the restraint against the possession of weapons contained in the initial TRO or any order thereafter. Finally, we note the finding of domestic violence was not based on one incident of name-calling but on an intended pattern of abusive and controlling behavior. We otherwise decline to address these improperly raised issues. Alloco v. Ocean Beach & Bay Club, 456 N.J. Super. 124, 145 (App. Div. 2018) (applying "well-settled" principle that appellate court will not consider an issue not raised before the trial court); State v. Robinson, 200 N.J. 1, 19 (2009) ("[t]he jurisdiction of appellate courts rightly is bounded by the proofs and objections critically explored on the record before the trial court by the parties themselves").

As we recognized in McGowan v. O'Rourke, 391 N.J. Super. 502, 507-08 (App. Div. 2007), the PDVA "specifically provides for an award of attorney's fees and, therefore, they are permitted by the Court Rules," citing Rule 4:42-9(a)(8). Thus, if a domestic-violence victim's attorney's fees are reasonable and incurred as a direct result of domestic violence, a court has discretion to award attorney's fees. Id. at 508.

The better course may have been to seek from us a limited remand for the trial court to address the already-pending fee application and for the trial court

to have addressed more specifically each factor enumerated in <u>Rule</u> 4:42-9(b). The trial court, however, engaged in a detailed analysis of the reasonableness of plaintiff's counsel's rate and the number of hours expended pursuant to <u>Rendine v. Pantzer</u>, 141 N.J. 292, 334-35 (1995), and we see no reason to disturb its conclusions.  <u>See</u> <u>id.</u> at 317 (holding "determinations by trial courts [regarding legal fees] will be disturbed only on the rarest of occasions, and then only because of a clear abuse of discretion").

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3608-19