24 A.3d 849

L.M.F., PLAINTIFF–RESPONDENT, v. J.A.F., JR., DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted May 25, 2011—Decided August 22, 2011.

Before Judges FUENTES, ASHRAFI and NUGENT.

*Burns & Associates,* attorney for appellant (*Michael R. Speck,* on the brief).

*L.M.F.*, respondent pro se.

The opinion of the court was delivered by

FUENTES, J.A.D.

Defendant J.A.F., Jr. appeals from a final restraining order (FRO) entered against him by the Family Part under the Prevention of Domestic Violence Act, *N.J.S.A.* 2C:25–17 to –35. The trial court's decision was based on a domestic violence complaint filed by defendant's former wife, plaintiff L.M.F., alleging harassment, *N.J.S.A.* 2C:33–4(a), as the predicate offense for the injunctive relief sought.

On appeal, defendant argues the trial court erred in issuing the FRO because plaintiff did not present sufficient evidence to sustain the predicate offense of harassment. We agree and reverse. Giving plaintiff the benefit of all reasonable inferences from the evidence presented, and accepting as true her testimony describing the events that led to the filing of the complaint against defendant, the evidence presented to the trial court was insufficient, as a matter of law, to prove the offense of harassment as defined in *N.J.S.A.* 2C:33–4(a).

I

The parties married in 1989 and divorced in August 2006. Two children were born of the marriage—a son age 19, and a daughter age 17. The parties have joint legal custody of the children, with plaintiff being the parent of primary residence. Defendant has remarried. The incidents that gave rise to this litigation involved defendant's efforts to obtain information concerning his daughter's social and academic activities and the potential for misuse inherent in our modern technological means of communication.

At the time plaintiff filed her complaint against defendant, the parties communicated primarily through "texting," which has been defined as

[t]he act of typing and sending a brief, electronic message (less than 160 characters) via a wireless network to another person so that they can view the short message on any number of mobile or handheld devices.

[*Texting*, NETLINGO, www.netlingo.com/word/texting/php (last visited August 8, 2011).]

Sometime in March 2010, the parties' daughter's high school basketball team won a state championship title. The school gave a banquet to celebrate the team's achievement and invited the parents to attend. Plaintiff received her invitation by mail. According to plaintiff, she assumed defendant had received a similar invitation by mail because "his personal information is on record with the school and he has the availability to contact the athletic department directly."

Defendant did not attend the banquet because he did not receive a notification from the school. He was upset and blamed plaintiff for not notifying him directly. According to plaintiff, defendant's current wife sent her approximately four text messages about this incident on an unspecified date, between 6:50 a.m. and 9:00 a.m. "in the morning before I went to work." Plaintiff did not save these text messages and could not otherwise elaborate on the substance of these communications.

THE COURT: In terms of the text messages, I need to know two things ... Was there cursing, was there abusive language, what was it?

PLAINTIFF: Basically, [defendant's current wife] was saying that I had an obligation, [defendant] attended all the games, and I should have told him about the event and this and that when our daughter is 17 years old and our son is 19.

The next relevant event concerned a Board of Education meeting in which the basketball team was to be recognized and honored for their achievement. On May 25, 2010, plaintiff received eight text messages between the hours of 7:32 a.m. and 8:19 a.m. from defendant's current wife. Plaintiff did not produce the messages she sent in response.[1] Despite this omission, the trial

---

[1] Based on the content of the messages, it is clear that they reflect only one side of a two-way electronic conversation between plaintiff and defendant's current wife.

court admitted into evidence the following text messages sent to plaintiff by defendant's current wife:

*7:32 a.m.:* Where do you get off telling [defendant] where I can and cannot go? Board of Ed. meetings, why would you tell him? FYI, it's only addressed to [defendant], get over it.

*7:33 a.m.:* may be [the parties' daughter]'s father but he's married to me now. He left you. We can go where ever we want TOGETHER.

*7:33 a.m.:* And don't worry. I wasn't going anyways. Save ur breath for someone who gives a shit about what you think.

*8:08 a.m.:* I read the text when u told him that it was only addressed to him. So don't deny it.

*8:08 a.m.:* I am over myself. U r the one who needs to realize ur marriage is over and u can't tell him or me what to do or where to go

*8:10 a.m.:* I will. And u stop telling me where I can and can't go.

*8:19 a.m.:* Then stop textin [sic] me. I don't want you saying anything about me. Period. I don't like to be associated with u in any way. So stop telling me where I can go.

*8:19 a.m.:* And I'm glad ur happy. So are we.[2]

The next incident of alleged texting harassment occurred on June 25, 2010. The topic of discussion on this date concerned the parties' daughter's SAT score. Defendant sent plaintiff the following eighteen text messages between the hours of 6:50 a.m. and 11:34 a.m.:

*6:50 a.m.:* A[n]y word on her sat score?

*8:33 a.m.:* A[n]y word on her sat score?

*9:29 a.m.:* A[n]y word on her sat score?

*10:02 a.m.:* Add this to the list

*10:31 a.m.:* Why don't you just tell me. Whats the big deal.

*10:40 a.m.:* By you not telling me things about our kids is proof that you are to blame for the kids acting the way view [sic] do to me. It confirms what everyone is telling Me that you are telling things to the kids that it should be between you and me. Maybe everyone should know that you screwed a[ ] married man had him

---

[2] In the interest of completeness and transparency, we note that some of the text messages were produced by plaintiff at trial after having forwarded them from her cellular phone to her email; the email was then printed, marked for identification, and ultimately admitted into evidence. The remaining text messages were read into the record by plaintiff directly from her cellular phone. Defense counsel was given the opportunity to review this group of messages before they were admitted into evidence in this fashion. Neither side objected to this procedure.

over your house more than once. Should have etexmne [sic] when I told them you never told me about the banquet. Thought the women wer[e] going to cry.

*10:41 a.m.:* Now they see who you are and why the kids don't talk to me.

*10:50 a.m.:* You are playing this game by not telling me t[h]ings about our kids. All I ask is to let me know ionsortant timing r [sic] with our kids. And you don't.

*10:51 a.m.:* Example you know her score and you don't tell me. Proof.

*10:56 a.m.:* Proof you are holding info from me about our kids.

*11:00 a.m.:* Simply asking you a question about our daughter's education and you choose not to tell me. Why?

*11:02 a.m.:* [addressing plaintiff by her first name] what did she score

*11:04 a.m.:* Every body asked why didn't [plaintiff] tell you? And them she said o my god I bo so sorry [sic].

*11:06 a.m.:* Can you just tell me t[h]ings about [their son] and [their daughter]. I need you[r] help with them.

*11:10 a.m.:* So we both don't look like ass hole parents that don't talk. Do it for [our children]. So we are not embarrassed im north [sic]

*11:31 a.m.:* Do you know why she won't talk to me cause it stopped the same time the emancipation. I built the chariot was planning on taking her re visit college and tiben bomb nothing [sic].

*11:34 a.m.:* Put our diff aside and help me with the kids. I want to be apart me [sic] their life

Plaintiff works Monday through Friday in the construction department of a municipality. She testified defendant sent these messages on a Friday and, because she usually arrives at work around 8:15 a.m., most of the text messages were sent to her during working hours. Plaintiff keeps her phone in her purse, and the purse in her desk. The phone vibrates when a message is received.

Plaintiff testified she responded to defendant's eighteen text messages "one time." She told him she didn't know the SAT score and "to contact [their daughter] directly. She is 17 years old, [and] has a cell phone." Plaintiff did not produce a copy of her response text message to defendant, or otherwise indicate to which of defendant's eighteen messages she responded. Defendant stopped texting plaintiff after she responded.

The final texting incident occurred on June 28, 2010, the Monday following the June 25, 2010 "SAT scores" event. According to plaintiff, "there was no communication over the weekend." On

Monday morning, plaintiff began receiving the following text messages from defendant:

*8:54 a.m.:* Did you find out [their daughter's] sat score?

*9:03 a.m.:* [calling plaintiff by her first name] we are both legal guardians, I don't understand why you withhold in[f]o[r]mation from me. I paid half me [sic] that test. If I don't hear from you by the end Me [sic] today *june 28 2010* with her score I will inform my attorney. Its wrong what you are doing with my and kids relationship. Consider this my last request for her sat score?

*9:11 a.m.:* I've had it with you ruining my relationship with our kids.

*9:51 a.m.:* FYI, I pay you $2,800 a month more than what you make. We pay almost $5,500 together for our kids. It's not you paying alone which you paint the picture of too.

*9:51 a.m.:* the kids. Don't kid yourself cause it could stop one day

According to plaintiff, she called defendant and asked him to stop contacting her at work. She decided to call rather than text "because [she] thought it was [ ] faster." When she reached defendant on the phone, "he started to get angry and yell at me or spew at me and then said 'Everybody knows you're nothing but a fucking scorned woman' and that's when I put him on speaker and then he hung up." Plaintiff then sent defendant a text message asking him to stop contacting her. Again, plaintiff did not produce a paper copy or an electronic record of the text message she sent to defendant. Thereafter, defendant sent plaintiff two text messages at 5:00 p.m. and 5:07 p.m., inquiring about the whereabouts of their daughter.

## II

After the testimony concerning the predicate offense concluded, the trial court questioned plaintiff about other incidents of domestic violence she had listed on her domestic violence complaint in support of a temporary restraining order. Specifically, the court asked plaintiff to elaborate on an incident that allegedly occurred in December 2005, when the parties were in the process of finalizing their divorce:

PLAINTIFF: [Defendant] wasn't living at the residence at that time and he-the children and I were living there and he felt he could just come in and go whenever he wanted to and when he came in he said he can do whatever he wants, this is his house.

THE COURT: All right.

. . . .

THE COURT: This is in the middle of the divorce?

PLAINTIFF: Yes, it is.

THE COURT: Okay. And when he said he can do whatever he wants, this is his house, where was he? *Was he in your face ...?*

PLAINTIFF: In the kitchen in my face, yes.

THE COURT: Okay. How close was he?

PLAINTIFF: It wasn't a—it was probably five feet in front of me. It was not in my face.

THE COURT: All right. And—

PLAINTIFF: Within—out of personal space, let's say that.

THE COURT: Okay. *And did he say it in a threatening manner* or did he just say it matter of fact?

PLAINTIFF: Anger, just angrily. Very angry.

THE COURT: All right. And did he do anything other than say that to you?

PLAINTIFF: No.

THE COURT: All right. *Were you fearful?*

PLAINTIFF: Yes.

THE COURT: All right.

PLAINTIFF: The whole time during my divorce I was fearful. He was constantly threatening me and angry. He's got a very angry disposition.

THE COURT: All right. . . . Did you contact the police at that point?

PLAINTIFF: No.

THE COURT: All right. And other than saying that, did he then turn around and walk away? What happened?

PLAINTIFF: I don't remember—

THE COURT: *Did he park himself on the couch?*

PLAINTIFF: No, he probably left because he wasn't living there.

[ (Emphasis added).]

The only other testimony plaintiff gave concerning prior incidents or history of domestic violence concerned "excessive texting." Plaintiff characterized the frequency of these text messages as "intermittent" and stated they "always revolve around when the children don't respond or acknowledge [defendant]." Plaintiff concluded her direct testimony with the following request from the court:

I'm just asking the Court that I want him to permanently leave me alone and stop this. We're divorced. I want to be left alone. I'm fearful at my job that I'm going

to lose my job because of the constant harassment. My co-worker had to deal with this for the past four years, upsetting me mentally. I'm fearful for my mental health. I can't continue to deal with him. His behavior is erratic. I never know when the outbursts are going to happen if one of the kids don't contact him. It's quiet and then all of a sudden now I've got all these text messages coming in for two days.

On cross-examination, plaintiff indicated that, although she keeps her cell phone either in her purse or in a desk drawer while she is at work, she can hear the phone vibrate when she is seated at her desk, even if she is talking on another phone at the time.

According to defendant, for the past three years text messaging had been "the primary means of communication" between plaintiff and him. The topic of these text messages was always the children. Defendant testified this arrangement worked well until he filed a motion to reduce his child support obligation in March 2010. He also stopped receiving text messages from his children during this same time. The last time he received a text message from his daughter was in March 2010, after he sent plaintiff an "emancipation letter." The following day, his daughter sent him a text message stating "they don't have money to pay for food anymore" because defendant had not paid $400 of child support. Defendant last heard from his son in February or March 2010.

Defendant admitted to sending plaintiff the text messages on June 25 and 28, 2010. He testified, however, that plaintiff intentionally kept from him information concerning the children's lives. Plaintiff also sent him inflammatory emails intended to provoke him into sending an angry response. When defense counsel attempted to substantiate the "provocation defense" by moving into evidence emails allegedly sent by plaintiff to defendant, the court denied admission of that evidence on relevancy grounds because the emails were not dated. This ruling prompted the following exchange between the court and defense counsel:

THE COURT: But I'll hear proffer as to what the e-mails contain. Is it just the ongoing squabble between them regarding the children?

DEFENSE COUNSEL: The ongoing squabble regarding the children and my attempt to show that the plaintiff provokes the behavior of the defendant by not responding with information, but, in fact, responding with attacks.

THE COURT: Okay. *But I don't think anybody disagrees that there's no communication between them or that the communication between them is unhealthy.* It would be relevant if it provoked his responses on—

DEFENSE COUNSEL: On those dates.

THE COURT:—the dates complained of.

DEFENSE COUNSEL: And since I can't establish that—

THE COURT: Yes.

DEFENSE COUNSEL:—then we're done there.

[ (Emphasis added).]

Based on this evidence, the court found plaintiff proved, by a preponderance of the evidence, that defendant committed the domestic violence act of harassment. The court concluded that, although there was no doubt defendant would have stopped his text messages if plaintiff had responded to his questions about their daughter's SAT score, that fact did not excuse defendant's conduct. After reciting the elements of harassment under *N.J.S.A.* 2C:33–4, the court stated:

I do find harassment in this matter because pursuant to subsection (a) he has communicated using offensive language through third parties and directly calling her a "fucking scorned woman" which caused her alarm enough that she had to put it on speaker phone to have somebody else witness it. Number two, he had his wife communicate using profanity, albeit only one profane statement. But, most importantly, pursuant to subsection (a), setting aside the offensively course language and also setting aside the fact that he did communicate with her at extremely inconvenient hours, choosing to send text messages to her about something that did not need to be addressed at 6:50 a.m., but he felt that need to do so, I find, most importantly, that he committed an act of harassment because he communicated with her in a manner that was likely to cause annoyance.

After citing our decision in *Silver v. Silver,* 387 *N.J.Super.* 112, 903 *A.*2d 446 (App.Div.2006) [3], the trial court concluded, without further elaboration, that a final restraining order should be issued against defendant.

---

[3] In *Silver,* we held that in addition to finding that a predicate offense has been committed, a trial court must also determine whether a domestic violence restraining order is necessary to prevent further abuse. *Id.* at 125–27, 903 *A.*2d 446.

## III

■ Defendant argues the trial court erred in entering the FRO against him because the evidence did not support a finding that he committed the predicate offense of harassment. We agree.

Our standard of review of a trial court's factual findings and conclusions of law is well-settled. We are bound by the findings of the court that are supported by adequate, substantial, and credible evidence. *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.*, 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974). This deferential standard is even more appropriate "when the evidence is largely testimonial and involves questions of credibility." *In re Return of Weapons to J.W.D.*, 149 *N.J.* 108, 117, 693 *A.*2d 92 (1997).

We will not disturb the "factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice...." *Rova Farms, supra,* 65 *N.J.* at 484, 323 *A.*2d 495 (internal quotation marks and citation omitted). Our Supreme Court has also recognized that Family Part judges have "special expertise in the field of domestic relations." *Cesare v. Cesare,* 154 *N.J.* 394, 412, 713 *A.*2d 390 (1998).

With these principles as our guide, we will now address the issues presented by defendant in this appeal. *N.J.S.A.* 2C:33–4 defines the petty disorderly offense of harassment as follows:

[A] person commits a petty disorderly persons offense if, with purpose to harass another, he:

a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;

b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or

c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

Harassment is the most frequently reported predicate offense among those statutorily recognized in *N.J.S.A.* 2C:25–19 as a basis for a finding of domestic violence. *J.D. v. M.D.F.,* 207 *N.J.* 458,

476, 25 *A*.3d 1045, 2011 *WL* 3189575 (2011). Despite the frequency of its use, however, harassment remains a vexing issue for the judges responsible for adjudicating domestic violence complaints in our State.

> [H]arassment is the predicate offense that presents the greatest challenges to our courts as they strive to apply the underlying criminal statute that defines the offense to the realm of domestic discord. Drawing the line between acts that constitute harassment for purposes of issuing a domestic violence restraining order and those that fall instead into the category of ordinary domestic contretemps presents our courts with a weighty responsibility and confounds our ability to fix clear rules of application.
>
> [*Ibid.* (internal quotation marks and citation omitted).]

The facts presented here exemplify the complexity of human interactions and the strain they place on Family Part judges as they struggle to distinguish between the cases that merit judicial intervention and those that do not. We conclude the evidence presented here shows only the convergence of modern technology and the foibles of human judgment. Our ability to instantaneously and effortlessly send electronic messages has created a gateway unfettered by reflection and open to rash, emotionally driven decisions. The ease and speed by which we transmit electronic messages has also created a commensurate expectation of an equally instantaneous response from the recipient.

Despite their decision to terminate their marriage, and in defendant's case to remarry, the parties' relationship as parents will never end. In an implicit recognition of this reality, the parties used texting as the primary means of communicating with each other concerning the welfare of their children. Both sides agreed that over the four years preceding this litigation, the subject matter of their text messages was always the children.

Given the emotional tension that seems to have remained following the divorce, texting provided an efficient means of exchanging information as parents, while avoiding the personal contact associated with a telephone call or a face-to-face encounter. The limited number of words that can be sent at any one time in a text message also minimized the risk for extraneous matters to interfere with the primary dialogue of parenting. Despite these quali-

ties, texting is merely a tool, a means to an end. Without reasonable cooperation, texting can lead to the frustration and misuse we witness here.

By her own admission, plaintiff responded only once to defendant's eighteen text messages inquiring about their daughter's SAT scores. As the trial court found, "there is no doubt ... that if [ ] plaintiff ... simply answered [defendant's] questions about the SATs ... he would [have] stop[ped]." Instead, plaintiff chose to ignore defendant's texts, leading him to increase the number and frequency of the messages.

Although in the realm of domestic abuse, harassment is arguably the least egregious of the offenses recognized by the Legislature as a ground for obtaining relief under the Domestic Violence Act, *N.J.S.A.* 2C:25–19, "there is no such thing as an act of domestic violence that is not serious." *Brennan v. Orban,* 145 *N.J.* 282, 298, 678 *A.*2d 667 (1996). What occurred here, however, was not harassment within the meaning of *N.J.S.A.* 2C:33–4 because the trial court did not find, and the evidence does not show, that defendant sent these text messages *for the purpose of harassing* plaintiff. *State v. Hoffman,* 149 *N.J.* 564, 581, 695 *A.*2d 236 (1997).

The trial court also mistakenly used the text messages on May 25, 2010, from defendant's current wife as evidence of harassing communications or a course of conduct by defendant. There is no evidence showing defendant directed his current wife to act as his proxy in this respect. The messages exchanged by these two women are a separate matter and should not have played any role in the court's determination of whether defendant committed the domestic violence act of harassment.

Plaintiff did not dispute before the trial court that defendant's only purpose in sending his text messages was to inquire about his daughter because the child had grown estranged from him. The texts became annoying to plaintiff only after she decided to ignore them. When his electronic messages were not answered, it was not unreasonable for defendant to assume he was being snubbed

or ignored. He manifested his frustration by resending the same message, over and over again, in a misguided attempt to provoke some kind of response from plaintiff. Had the communications involved subjects other than legitimate concerns about the children's lives, defendant's persistence might have eventually been viewed as infused with a purpose to harass plaintiff. Divorced parents must necessarily communicate from time to time about their children. As the trial judge aptly noted, the parties' communications at this point were indeed "unhealthy." Dysfunctional as defendant's behavior may have been, however, without the requisite intent to harass his conduct was not actionable under the Domestic Violence Act.

▮ Further, even if plaintiff had presented sufficient evidence to establish the predicate offense of harassment, we conclude defendant's conduct did not warrant the issuance of domestic violence restraints. *Silver, supra,* 387 *N.J.Super.* at 126–27, 903 *A.*2d 446. The evidence of the parties' interactions during the marriage and after its termination does not implicate the public policy concerns identified by the Legislature in the Domestic Violence Act, *N.J.S.A.* 2C:25–18. As Justice Hoens admonished in *J.D.,*

> [a]lthough evidence offered by a putative victim may therefore suffice to meet the definition of harassment, courts must be careful not to overlook the statutory requirement that there be a finding that "relief is necessary to prevent further abuse." *N.J.S.A.* 2C:25–29(b). Merely concluding that plaintiff has described acts that qualify as harassment and omitting this added inquiry opens the door to potential abuse of the important purposes that the Act is designed to serve and threatens to trivialize the plight of true victims, in the process.
>
> [*J.D., supra,* 207 *N.J.* at 476, 25 *A.*3d 1045 (internal quotation marks and citation omitted).]

Here, the evidence before the trial court did not show a history of domestic abuse by defendant against plaintiff. The remark made by defendant to plaintiff during the pendency of their divorce that "this is his house" and he could do what he wanted was an isolated incident devoid of any menacing behavior by defendant. Although spoken in anger and in close proximity to

plaintiff's "personal space," the remark was not part of a pattern of verbal or physical abuse.

By all indications, this incident was merely an expression of anger by defendant during an emotional and highly stressful period of time for both parties. Thus, even if plaintiff had proven the predicate offense of harassment, there is no evidence that a final restraining order is necessary to prevent future abuse. *Silver, supra,* 387 *N.J.Super.* at 126–27, 903 *A.*2d 446.

Finally, plaintiff did not initially offer evidence that she was in fear of defendant. The court prompted her to do so by a series of leading questions, as we have underscored. We understand that a great number of domestic violence cases are heard without the benefit of counsel guiding a witness's testimony in a manner consistent with the rules of evidence. We are equally mindful that "[t]rial judges are vested with the authority to propound questions to qualify a witness's testimony and to elicit material facts on their own initiative and within their sound discretion." *State v. Medina,* 349 *N.J.Super.* 108, 131, 793 *A.*2d 68 (App.Div.), *certif. denied,* 174 *N.J.* 193, 803 *A.*2d 1165 (2002). The concern over judicial involvement in the manner the court receives testimonial evidence is also "less acute in the context of bench trials." *State v. Taffaro,* 195 *N.J.* 442, 451, 950 *A.*2d 860 (2008). That being said, a trial judge must take special care to craft questions in such a manner to avoid being perceived as an advocate for any side of a dispute. *See State v. O'Brien,* 200 *N.J.* 520, 535, 984 *A.*2d 879 (2009).

Reversed.