**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4085-19

D.M.R.,[1]

      Plaintiff-Respondent,

v.

M.K.G.,

      Defendant-Appellant.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **May 11, 2021** |
| **APPELLATE DIVISION** |

Submitted March 17, 2021 – Decided May 11, 2021

Before Judges Fuentes, Whipple, and Rose.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Atlantic County, Docket No. FV-01-1206-20.

Helmer, Conley & Kasselman, PA, attorneys for appellant (Barry J. Serebnick, of counsel and on the brief).

Respondent has not filed a brief.

The opinion of the court was delivered by

WHIPPLE, J.A.D.

---

[1]  We use initials to protect the identity of victims of domestic violence and to preserve the confidentiality of these proceedings. R. 1:38-3(d)(10).

On January 23, 2020, in <u>Pathri v. Kakarlamath</u>, 462 N.J. Super. 208 (App. Div. 2020), acknowledging our rules provided little real guidance, we addressed how a judge should assess a party's request to appear at trial and present testimony by way of contemporaneous video transmission. Little did we know that within two months our entire court system would begin to rapidly transform from in-person to virtual court proceedings, utilizing various remote video and telephonic platforms, in an effort to continue operations amid the social distancing measures necessitated by the COVID-19 pandemic.

Since that time, New Jersey Courts have operated primarily remotely via platforms like Zoom, Microsoft Teams, and telephone conferences, with the goal of preserving the quality of justice our courts have traditionally striven to provide when court was conducted in-person. Trial courts and staff have undertaken a herculean effort in rising to this unprecedented challenge. However, despite their efforts, the formality of the courtroom can fall away. Everyone may not have the same access to technology. These proceedings often involve unrepresented litigants unfamiliar with court proceedings, which presents its own challenges now amplified by the virtual proceeding. Moreover, judges do not have the same mechanisms to control the proceeding that they would have in a live courtroom. Through that lens we address this appeal.

I.

Defendant M.K.G. appeals from the May 29, 2020 final restraining order

(FRO) entered against her pursuant to the Prevention of Domestic Violence

Act (PDVA), N.J.S.A. 2C:25-17 to -35, based on a single alleged predicate act,

harassment, N.J.S.A. 2C:33-4(a).   Defendant raises the following issues on

appeal:

> POINT I: THE TRIAL COURT ERRED IN
> DETERMINING THAT [M.K.G.] COMMITTED
> THE PREDICATE ACT OF HARASSMENT,
> N.J.S.A. 2C:33-4(a).
>
> POINT II: THE TRIAL COURT ERRED IN
> FAILING TO CONDUCT THE REQUIRED LEGAL
> ANALYSIS TO ENTER [AN FRO] UNDER SILVER
> V. SILVER,[2] AND ITS PROGENY.
>
> POINT III: [M.K.G.] WAS DEPRIVED OF DUE
> PROCESS OF LAW DUE TO NUMEROUS TRIAL
> IRREGULARITIES STEMMING FROM A REMOTE
> PROCEEDING. (NOT RAISED BELOW).
>
>> A. Based upon the record, defendant had
>> insufficient notice and opportunity to
>> prepare a defense in her case.
>>
>> B. Plaintiff testified in the presence of and
>> with coaching from his mother--the only
>> other witness in the remote proceeding.

---

[2]  387 N.J. Super. 112 (App. Div. 2006).

A-4085-19

> C. The trial court engaged in inappropriate questioning of [M.K.G.] regarding the credibility of a plaintiff's witness.

Plaintiff and defendant had a dating relationship that had ended, and on May 20, 2020, defendant went to plaintiff's house at 12:30 a.m. to discuss a dog, whose ownership is unclear, but that had been part of both of their lives. Each party related a different version of what happened during the incident that night. On May 21, a municipal court judge issued an ex parte temporary restraining order (TRO) against defendant. At the initial FRO hearing in the Family Part on May 28, 2020, the court determined that plaintiff wished to proceed and advised defendant of the consequences of an FRO. The Family Part judge heard the case telephonically, and both parties appeared pro se, also telephonically. The court asked defendant if she wished to proceed with a trial that day. She stated that she did. The court then asked defendant whether she wanted to consult an attorney or retain one to represent her. She first responded she did not, and she wanted to proceed with the trial that day. Defendant then asked whether it would be "in [her] best interest to talk to an attorney." The judge responded, "it never hurts you." He asked defendant additional questions about the case, and then stated "it's up to you . . . . [I]f you want to postpone to talk to a lawyer, we can. It's up to you. I can't make the

decision for you."  Defendant responded, "I don't really think that it's necessary, Your Honor."

The judge said he would proceed with the trial.  However, thereafter, it became clear that defendant had never been served with a copy of the TRO complaint.  The court attempted to reschedule the hearing for June 17, but defendant informed the court that she had military duties on weekdays during the month of June and was unsure whether she would be able to call the court to attend the trial.  The judge asked whether defendant was available the very next morning, May 29, and she stated she was.  The judge then confirmed that the court would email both parties an invitation to appear at the hearing via Zoom.  He asked the parties if they had used Zoom before, and defendant stated that she had not.[3]

The judge then told defendant he would email her the TRO complaint "so you get service today."  He explained the harassment allegation against her "just so she knows, in case she doesn't get the complaint . . . ."  He suggested defendant could look at the complaint again, but he "just read it to [her] so [she] already know[s] what it's about."  The judge then confirmed for plaintiff

---

[3]  The May 28, 2020 transcript states the hearing was held via Zoom, but the judge stated that the parties were "on the phone."

that defendant had been served the complaint "[f]or all intents and purpose[s] . . . . [Defendant] acknowledged it and we're going to email it to her."

The following day the parties appeared via Zoom. Plaintiff testified that he and defendant had a prior dating relationship and around 12:30 a.m. on May 20, 2020, he awoke and heard his dog barking and his brother running down the steps. Then, he heard his mother on the phone with the police and heard banging on his window and front door. Plaintiff saw defendant outside his house with four men and two vehicles, and defendant was repeatedly calling his phone. He also testified that a man was knocking on his window. Plaintiff further testified that his mother told him defendant was the first one to knock. The judge then asked plaintiff if his mother was going to testify, to which he responded:

> PLAINTIFF: I mean, my mom's right next to me. She has work, but she can -- I mean, my mom was the first one to answer the door when [defendant] knocked, and then the guy started to knock and it was kind of just . . . aggressive. It was kind of --
>
> MOTHER: Well, you didn't know what was happening because you were still (indiscernible) --
>
> PLAINTIFF: Yeah, I -- I was --
>
> THE COURT: She can't help you out. You can't -- she -- if that's your mom, she can't help you testify, all right? She'll have to remain quiet. All right.

6

A-4085-19

Plaintiff testified that he heard the "people [defendant] brought . . . banging on the windows of the house and trying to get in by jiggling the doorknob and banging on the door and yelling for me to come outside." He said the police came, he filed a criminal complaint, and "they drove off." The judge asked defendant if she had any questions for plaintiff, and she said she did not.

Plaintiff's mother testified she was asleep when someone was aggressively pounding on the door, and she went to answer it. She testified defendant asked her whether her son was home and told her to go get her son. There were three men standing behind defendant, the mother said, and they were yelling at her to "bring my pussy son outside." She said the men were aggressive, but defendant was not, but all were intimidating to the mother. She asked them to leave, she shut the door, and the mother said she heard or saw the men bang on her son's window and shake the door handle; she then called the police. The mother testified that since that night, defendant had emailed plaintiff "regarding a dog" and also attempted to contact her other son. The mother's testimony was unclear about who was knocking on the doors and windows. No one testified they saw defendant banging on the door or shaking the door handle. The mother testified she smelled alcohol "on breath" but did

7

not identify on whose breath. Again, defendant was offered an opportunity to ask questions of plaintiff's mother and declined.

Defendant's account of the incident differed. She testified she had gone to plaintiff's house to reclaim the dog he had gifted to her while she was in boot camp for military training. Defendant testified that when she broke up with plaintiff, he didn't want the dog anymore and that she needed to take it. Plaintiff had brought the dog to defendant's house and left it in her back yard while she was out of state for work. Defendant had been informed by her own mother that plaintiff wanted ownership of the dog. On the night of the incident, defendant was playing cards and decided to pick up her brother. On the way to getting her brother, defendant wanted to stop at plaintiff's house to discuss the dog. Defendant testified that she knocked on the door and asked to speak to plaintiff about the dog. Plaintiff's mother answered the door and said she wouldn't wake plaintiff, so defendant said she walked away from the door. Defendant also testified that she was "only there with my mom and my two [female] friends."

Defendant also told the court she had no violent history with plaintiff; they had never fought or had any confrontation. Plaintiff did not dispute these assertions. Defendant confirmed that she had emailed plaintiff and his brother regarding the dog after the incident. She testified that "now that I know that

8

[the dog] has a home, I have no reason to reach out to [plaintiff]."  Defendant stated that she had just returned home from the military and that she had only contacted plaintiff after their breakup one time, because of the dog.  Defendant further testified that she thought plaintiff's mother was "getting mad about the dog and everything else."  Defendant reiterated that she was only at plaintiff's house to see if they found a home for the dog.  The judge offered plaintiff an opportunity to question defendant, so both plaintiff and the judge questioned defendant:

> THE COURT: Okay.  Any -- [plaintiff], you want to ask [defendant] any questions?
>
> PLAINTIFF: I just -- she said -- you said there was no guys, right?
>
> DEFENDANT: No.
>
> PLAINTIFF: Okay.  And you said the only reason you came to the house was to talk?
>
> DEFENDANT: Yes, because that was the same day that you were writing my mom about [the dog].
>
> PLAINTIFF: So, if any of my brothers -- if any of my brothers would say what would happen, would that -- would that be any concern of -- Judge, I'm sorry -- or if my -- if my --
>
> THE COURT: (Indiscernible) question if her -- if your brothers testified and verified there were men there, would that change her testimony?

9

PLAINTIFF: No. If there was -- if there was, like, video cameras across my neighbor's house -- my neighbors have video cameras, and I mean, both my brothers were awake. So, would any of that (indiscernible) --

THE COURT: It's up to you, sir. I'm not telling you how to try your case.

PLAINTIFF: Would it change her testimony, I'm sorry.

THE COURT: [Defendant], if he has a video of you with men there, would that -- would that -- does that concern you?

DEFENDANT: No, Your Honor.

II.

After hearing the remote testimony, the judge granted the FRO for plaintiff:

> The facts are as follows, and some of the facts really aren't contested. [D]efendant . . . went out of the way to go to the plaintiff's house. That's number one. I find in this case that it was -- it was an intentional, purposeful deviation from the normal route . . . . Second, the time. This is between 12:30 a.m. and 1 a.m. I understand you're concerned about a dog, but I don't believe you.
>
> . . . .
>
> You may have been there to talk about the dog. That part may be true, because it looks like there's facts on both sides that there w[ere] issues with the dog, but . . . driving out of your way . . . in the middle of the night tells me you went there to conduct

10

business that was not in the ordinary course . . . . And there was offensive language and disturbing or threatening comments at the door.

I don't know if [defendant] was fully engaged in all that. There was some male there calling -- telling the mother to get her pussy son out of the house, but you were part of it . . . . It was alarming, it was [at] extremely inconvenient hours, and it was for no legitimate business purpose.

. . . .

This seems to have some hostility associated with it, and I'm going to enter [an FRO] for that purpose.

In his findings, the judge stated that he didn't know if plaintiff was afraid, but the judge found the totality of the circumstances to be "scary." He found the mother credible, and opined she had no reason to make up stories about whether additional parties had been at her house that night. The judge pointed to the "extra concern about a mother protecting her children that was persuasive." The court entered an FRO at the end of the hearing, forbidding defendant from contacting plaintiff, his mother, and two brothers who live in the house. The judge advised defendant that criminal charges remained pending against her. This appeal followed.

## A.

Addressing defendant's argument that she was deprived of due process because of numerous irregularities stemming from the remote proceeding, we conclude some of her arguments have merit.

Our Supreme Court has found that due process is violated when a defendant must go forward with an FRO trial twenty-four hours after being served with a domestic violence complaint. H.E.S. v. J.C.S., 175 N.J. 309, 323-24 (2003). Here, defendant was not served with a copy of the complaint at the time of the first hearing. When the court discovered this deficiency, the court emailed her a copy of the TRO complaint and scheduled the matter for trial the following day. This provided defendant less than twenty-four hours' notice to prepare and defend herself. We acknowledge the record demonstrates defendant agreed to proceed; however, she was not represented by counsel.

Furthermore, the trial court has an independent duty to determine the cause of failure to serve a defendant, even if he or she does not object to the failure to serve or request an adjournment. A.M.C. v. P.B., 447 N.J. Super. 402, 419-23 (App. Div. 2016). The PDVA and New Jersey Domestic Violence

12

Procedures Manual[4] "ensure that individuals charged with committing domestic violence offenses are treated fairly and receive the full panoply of due process rights guaranteed by our federal and State constitutions." Id. at 421.

Moreover, the urgent rush to trial the following day is not supported by the record. It was within the bounds of the court's discretion to maintain the TRO and reschedule the FRO trial to a point in time when defendant could adequately prepare her defense. Indeed, during the second hearing, it was clear defendant did not fully apprehend her right to call witnesses:

> THE COURT: [D]o you have anything else you want to tell me? Any other witnesses? Any other evidence?
>
> DEFENDANT: I just have the witnesses of the people that were with me.
>
> THE COURT: Are they going to testify?
>
> DEFENDANT: They can but they're not here with me.
>
> THE COURT: Today's the trial.

---

[4] "A brief adjournment may be required if the judge determines that the defendant did not have adequate notice and needs time to prepare." Supreme Court of N.J. & Attorney Gen. of N.J., State of New Jersey Domestic Violence Procedures Manual (Oct. 9, 2008), § 4.12, available at https://www.njcourts.gov/courts/assets/family/dvprcman.pdf.

When presiding over any adjudication, judges must "preserve the integrity of the judicial process, even from the appearance of impropriety." Id. at 422. Based on our review of the record, the court's conclusion at the first hearing that "for all intents and purposes she is served" fell short of due process.

B.

Although there are obvious, understandable challenges facing judges who seek to administer effective trials using videoconferencing technology, court directives and due process must nevertheless be maintained. Specifically, each witness must be alone while remotely testifying. "The purpose of sequestration is to discourage collusion and expose contrived testimony." Morton Bldgs. Inc. v. Rezultz, Inc., 127 N.J. 227, 233 (1992) (citing 1 Stephen A. Saltzberg & Michael M. Martin, The Federal Rules of Evidence Manual 736 (5th ed. 1990)). The presence of plaintiff's mother throughout this trial was problematic. Additionally, the parties should not address one another directly, as they did here. These longstanding guardrails remain in place alongside technological advances so that courts may continue to fairly and effectively serve the public amid a grave public health crisis.

In a bench trial such as this, a judge may examine witnesses to clarify testimony, aid the court's understanding, elicit material facts, and assure the

efficient conduct of the trial.  State v. Medina, 349 N.J. Super. 108, 131 (App. Div. 2002); N.J.R.E. 614.  However, even in a Zoom bench trial, "a trial judge must take special care to craft questions in such a manner to avoid being perceived as an advocate for any side of a dispute."  L.M.F. v. J.A.F., 421 N.J. Super. 523, 537 (App. Div. 2011).

A judge should avoid crossing "that fine line that separates advocacy from impartiality.  When that occurs there may be substantial prejudice to the rights of one of the litigants."  Village of Ridgewood v. Sreel Inv. Corp., 28 N.J. 121, 132 (1958).  While a judge may have to question a pro se party to elicit necessary testimony, "[t]hat should be done in an orderly and predictable fashion . . . and not at the expense of the parties' due process rights."  Franklin v. Sloskey, 385 N.J. Super. 534, 543 (App. Div. 2006).

Here, the trial court's questioning of plaintiff's mother at times approached advocacy:

> THE COURT: Okay.  Let me call Ms. -- this is [the judge].  I'm going to recall [plaintiff's mother].  [Mother], come back to the -- to the video.
>
> [MOTHER]: Yes, Your Honor.
>
> THE COURT: Okay.  You heard [defendant's] testimony.  Does that -- do you have any (indiscernible)?
>
> [MOTHER]: That is concerning to me because I do have the ability -- I guess a question would be to you

what if I (indiscernible) and once I get in contact with the [realtor] for the house next door, if I can produce the video showing that there were gentlemen standing in my backyard, [defendant], I am appalled that you're even lying about this right at this moment, but what --

THE COURT: (Indiscernible).

[MOTHER]: -- would happen to her if --

THE COURT: Your testimony is inconsistent with what she said and your recollection is there w[ere] men there and you think --

[MOTHER]: That -- yes.

THE COURT: -- and you think -- you think there's a recording from neighbors that show that?

[MOTHER]: Yeah, I -- that (indiscernible) 100 percent sure of, but I'm pretty sure that I could get it, and I also have two other children in this house that saw them standing on my back porch.

The judge's questioning of defendant also failed to meet the requisite standard of impartiality:

THE COURT: (Indiscernible) what was the urgency to go there at 1 -- at 12:30 or 1:00 in the morning? (indiscernible) --

DEFENDANT: Your Honor, I didn't go there with intentions -- like, I didn't leave the house saying, like, oh, I'm going to stop at [plaintiff's house]. It's just that the area we were in (indiscernible) "[Plaintiff's] house is right over here. Like, you think that we could stop? I really want to talk to him, figure out what's going on with [the dog]." When [plaintiff's mother] said that there were arrangements for his son to -- or

16

A-4085-19

her son to take [the dog] temporary, that's not true. I have a message (indiscernible) --

THE COURT: You're not answering my question. You're not answering my question, though. Why at 1:00 in the morning?

DEFENDANT: Your Honor, it was just because we were in that area on the way to [pick up my brother].

THE COURT: Yeah, but that doesn't make any sense to me. Why -- what was the urgency to do that at 1:00 in the morning when everybody's sleeping?

DEFENDANT: Your Honor, it wasn't really an urgency. It was really just I was out that way and I was like I really want to stop and talk to him.

THE COURT: Did you think he was sleeping?

DEFENDANT: Honestly, I've been home for like a week and a half and everybody's on quarantine, so I really didn't know if he'd be sleeping or not.

We conclude that the irregularities during the remote trial, including improper service of the TRO and the judge's colloquy substantially prejudiced defendant, depriving her of due process. Sreel, 28 N.J. at 132; see also Franklin, 385 N.J. Super. at 543.

## III.

When determining whether to grant an FRO under the PDVA, a court must undertake a two-part analysis. Silver v. Silver, 387 N.J. Super. 112, 125-27 (2006). "First, the judge must determine whether the plaintiff has proven,

17

by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. Second, the judge must determine whether a restraining order is necessary to protect the plaintiff from future danger or threats of violence. Id. at 126-27.

Since this case turned almost exclusively on the testimony of the witnesses, we defer to the Family Part judge's credibility findings, as he had the opportunity to listen to the witnesses and observe their demeanor. See Gnall v. Gnall, 222 N.J. 414, 428 (2015) (indicating reviewing courts should defer to the trial judge's credibility determinations). We discern no basis on this record to question the judge's credibility determinations.

Under the first prong of Silver, the court found defendant guilty of harassment. 387 N.J. Super. at 125. A person is guilty of harassment where, "with [the] purpose to harass another," he or she:

> a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm; [or]
>
> . . . .
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
>
> [N.J.S.A. 2C:33-4(a) to (c).]

18

Harassment requires the defendant act with the purpose of harassing the victim.  J.D. v. M.D.F., 207 N.J. 458, 486 (2011).  A judge may use "[c]ommon sense and experience" when determining a defendant's intent. State v. Hoffman, 149 N.J. 564, 577 (1997) (citing State v. Richards, 155 N.J. Super. 106, 118 (App. Div. 1978)).  "'A finding of a purpose to harass may be inferred from the evidence presented' and from common sense and experience."  H.E.S., 175 N.J. at 327 (quoting Hoffman, 149 N.J. at 577). Under the definition of harassment, "any other course of alarming conduct" and "acts with purpose to alarm or seriously annoy" are to be construed as "repeated communications directed at a person that reasonably put that person in fear for his safety or security or that intolerably interfere with that person's reasonable expectation of privacy."  State v. Burkert, 231 N.J. 257, 284-85 (2017).

Having reviewed the record, we conclude that there was minimal but sufficient evidence to support the determination defendant committed the predicate act of harassment consistent with the PDVA in support of the first Silver prong.  387 N.J. Super. at 125.  The court found specifically that defendant was at plaintiff's house at an inconvenient hour accompanied by other people and that she knocked on the door with a purpose to annoy.  The judge did not find defendant spoke in a crude or offensive manner or in a

19

course of conduct with repeated acts. N.J.S.A. 2C:33-4(a) and (c). Nevertheless, we will not disturb the trial judge's finding that the defendant committed the predicate act of harassment. N.J.S.A. 2C:33-4(a).

However, the judge erred in finding plaintiff required an FRO to protect him from future acts of domestic violence. In determining whether a restraining order is necessary, the judge must evaluate the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6) and, applying those factors, decide whether an FRO is required "to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127. Whether a restraining order should be issued depends on the seriousness of the predicate offense, "the previous history of domestic violence between the plaintiff and defendant including previous threats [and] harassment[,]" and "whether immediate danger to the person or property is present." Corrente v. Corrente, 281 N.J. Super. 243, 248 (App. Div. 1995) (citing N.J.S.A. 2C:25-29(a)).

Here, the judge found an FRO was necessary to protect plaintiff from further harassment by defendant, but he made no findings and applied none of the factors. Plaintiff did not express fear of defendant; indeed, the judge stated that he did not know whether plaintiff was afraid. Moreover, even plaintiff's mother testified defendant was not aggressive.

20

Defendant explicitly stated at numerous points during the trial that she had no reason to further contact plaintiff.  Thus, the court erred when it failed to consider plaintiff's lack of need for future protection.  <u>Silver</u>, 387 N.J. Super. at 127.  It is undisputed that there was no previous history of domestic violence between the parties.  <u>Corrente</u>, 281 N.J. Super. at 248.  Because the trial court's application of the law was clearly erroneous, we are constrained to reverse the FRO against defendant.

Reversed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION