# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0054-19

S.S.D.,

    Plaintiff-Respondent,

v.

M.A.D.,

    Defendant-Appellant.

_____

        Argued September 29, 2021 – Decided October 21, 2021

        Before Judges Fuentes, Gilson, and Gummer.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FV-02-0066-20.

        Ana R. Tolentino argued the cause for appellant.

        S.S.D., respondent pro se.[1]

PER CURIAM

---

[1] Plaintiff S.S.D. submitted a brief in response to defendant's appeal but did not appear at oral argument. We use initials to protect the identity of domestic-violence victims and to preserve the confidentiality of these proceedings. R. 1:38-3(d)(10).

Defendant appeals a final restraining order (FRO), which was entered pursuant to the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35 (PDVA), arguing, among other things, the trial judge erred in finding plaintiff had proven the predicate act of harassment. Because Judge Nina C. Remson's decision was supported by substantial, credible evidence, we affirm.

I.

We glean these facts from the trial conducted by the court. The parties were a married couple who had been together for more than thirty-eight years. When the court issued the FRO, the parties had a twelve-year-old son, a nineteen-year-old daughter, and a twenty-one-year-old son.

On the evening of July 2, 2019, when plaintiff returned home after taking the parties' twelve-year-old son to a local firework show, she sent their son to his bedroom and entered the bedroom she previously had shared with defendant. Plaintiff was sleeping on a couch and was no longer sleeping in their bedroom because she was "afraid to close [her] eyes in the bedroom." She told defendant she needed to talk to him about making some repairs to their home. When defendant responded by saying, "I'm not fixing any home," plaintiff continued to discuss the need to make the repairs. In testimony Judge Remson found "highly credible," plaintiff stated:

[I]t escalated fairly quickly . . . I said you have to fix it. And he says, you know, you're bugging me and you're provoking me and I said, I'm not provoking you, I just really need this fixed because it's -- besides being a biohazard it's uncomfortable for the kids, we can fix it, and the expletives started to tumble out and I didn't raise my voice . . . he says, no, you're provoking me and we both know what happens when you provoke me, and it was something about the way he said it that I just -- something in me said if I don't leave this room and say one more [word] it's going to escalate fairly quickly . . . .

Plaintiff "felt he threatened me because I felt at that very moment that if I said one more word that he was going to get off that bed, as he has in the past and come at me . . . . " She believed the "inference" of a bodily-injury threat "was clear based on our past history." According to plaintiff, their history included prior domestic-violence incidents and a conversation about plaintiff's sister, who had been killed by her fiancé, in which defendant said to plaintiff, "you have to wonder what she did to bring all that on."

Plaintiff left their bedroom and relayed to their twelve-year-old son and their daughter a code word meaning "we need to get out of the house." Plaintiff had developed the code word as part of an exit plan she had created in an Alternative for Domestic Violence program, which she had attended for over a year. When their daughter and son left the house, plaintiff called the police.

3

Two police officers arrived and asked her what had happened and if this had been "the first time." When she explained that this was not the first incident, the officers went into the house and returned, saying defendant had "basically corroborated" what she had said. She told the officers she thought she needed protection and went with them to the police station.

Early the next morning, a temporary restraining order (TRO) was issued. In her complaint seeking the TRO, plaintiff alleged defendant had harassed her "by shouting vulgarities at her," calling her "a bitch, a whore, and a cunt." She also asserted that his statement "you're provoking me, and you know where this goes" caused her "to become alarmed because she felt that [defendant] was referencing instances in the past where he had been physically abusive towards" her. She described a history of domestic violence involving "unreported shoving and striking with opened and closed fists." A week after she filed her complaint, plaintiff amended it to include additional allegations regarding past domestic-violence acts.

Judge Remson conducted a two-day trial, during which each party testified. After plaintiff testified about the events of the evening of July 2, 2019, Judge Remson asked her how she knew she "would need to leave or it would escalate." In response, plaintiff referenced and testified about "past incidences."

4

Plaintiff described defendant's behavior as she drove him to a bus stop on the morning of the July 2 incident, stating he used "expletives" and "put downs" and told her "you ruined my fucking life" and "I despise you." She asserted defendant behaved like that "probably every morning – well, at least four out of five." Three weeks previously, while she was driving their family to their son's scouting event, defendant had "scream[ed] in [her] ear," calling her a "bitch," and saying he hated her, she had "ruined" his life, and he didn't "give a fuck" if their children heard him say those things to her because they "need[ed] to hear it."

She described a 2018 incident driving home from a movie with two of their children when defendant "started yelling" at her, saying he didn't "like [her] fucking shoes" and calling her "a fucking bitch." She repeated what defendant had said to her on her last birthday: "[y]ou know I absolutely despise you but I guess I could wish you a happy birthday, for what it's worth." He then "start[ed] in with . . . the play list," meaning "when he's constantly berating me . . . usually involv[ing] me being called any number of expletives." Plaintiff testified, "whenever I'm in his presence it appears that he can't control himself and at this point it doesn't matter whether the kids are around or not" and "what's become scary is it requires no input from me whatsoever."

5

In addition to the "litany of verbal abuse," plaintiff provided examples of when defendant had been physically abusive. She described an earlier incident in their bedroom when he threw clothes at her and told her to "get the fuck out" after she had asked him to attend a bible study class with her. She testified defendant had "shoulder check[ed]" her as she passed him fourteen times in the past eighteen months, once every six to eight weeks. She said defendant had engaged in "choking" behavior about ten times in 2015 and 2016, placing her "in a headlock or . . . arm around the neck" and would "push [his] hand to [her] face," causing her discomfort and injury to her eye.

Defendant cross-examined plaintiff and testified. He admitted saying on the evening of July 2 "you're provoking me" but denied adding "and we both know what happens when you provoke me" or calling her names. He did not testify as to what he meant by "you're provoking me" or what he believed she was provoking him to do. As for past incidents, he conceded the parties had argued but equated their arguments to normal marital disagreements. Although he asserted "name-calling and berating never happens," he also stated "couples use things to get each other's attention, let them know they're serious . . . So, yes, unfortunately, those words do come out." He otherwise denied,

6

recharacterized, or did not recall the other alleged prior domestic-violence incidences.

In a comprehensive opinion placed on the record, Judge Remson held defendant committed an act of harassment against plaintiff during the July 2 evening incident. The judge made express credibility findings, concluding plaintiff was more credible than defendant. Plaintiff was "straightforward" and "consistent," and her version of events was "more plausible" than defendant's version. Defendant "often answered that he did not recall events," and his testimony was "disingenuous," "not always consistent, and was often unbelievable."

Citing defendant's statements to plaintiff "[y]ou are provoking me" and "[w]e both know what happens when you provoke me," Judge Remson found "[i]n light of the extensive prior history of domestic abuse, including multiple assaults, the plaintiff interpreted this statement as a threat to assault her" and "defendant intended to threaten exactly that, and cause alarm to the plaintiff, in violation of N.J.S.A. 2C:33-4(a)." Having found plaintiff had proven the predicate act of harassment, Judge Remson, pursuant to our holding in Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006), addressed the need for entry of an FRO and held, based on the parties' testimony about the predicate act and

"extensive prior history," an FRO was "necessary to protect the plaintiff from imminent harm and further acts of domestic violence."  The judge issued the FRO on July 23, 2019, and subsequently issued two amended FROs, addressing issues regarding support and the parties' minor son.

On appeal, defendant argues the trial judge (1) erred in finding plaintiff had proven a predicate act of harassment because, according to defendant, plaintiff's allegations were not corroborated by credible testimony, and (2) abused her discretion by permitting hearsay testimony about incidents unrelated to the events of July 2, 2019.  Because the judge's finding of harassment was supported by plaintiff's testimony, which the judge found credible, and because the judge did not err in considering testimony about prior domestic-violence incidents between the parties, we affirm.

## II.

Our review of a family judge's factual findings is limited.  N.J. Div. of Child Prot. & Permanency v. J.B., 459 N.J. Super. 442, 450 (App. Div. 2019). We defer to a family judge's factual findings when supported by substantial, credible evidence in the record because the judge "has the superior ability to gauge the credibility of the witnesses who testify" and has "special expertise in matters related to the family."  N.J. Div. of Youth & Fam. Servs. v. F.M., 211

N.J. 420, 448 (2012); see also Cesare v. Cesare, 154 N.J. 394, 413 (1998). "We recognize that the cold record, which we review, can never adequately convey the actual happenings in a courtroom." F.M., 211 N.J. at 448. We intervene only when a trial judge's factual conclusions are "so wide of the mark" they are "clearly mistaken." N.J. Div. Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007). We defer to a judge's credibility determinations. Gnall v. Gnall, 222 N.J. 414, 428 (2015). We review de novo a judge's legal conclusions. J.B., 459 N.J. Super. at 451.

We have identified harassment as "the most frequently reported predicate offense," L.M.F. v. J.A.F., Jr., 421 N.J. Super. 523, 533 (App. Div. 2011), in domestic-violence cases and as "[t]he most often cited potential misuse of the [PDVA]," A.M.C. v. P.B., 447 N.J. Super. 402, 417 (App. Div. 2016). We, however, also have recognized, "[a]lthough a defendant might not use direct physical violence when he or she engages in the predicate act[] of harassment, . . . [harassment] can cause great emotional harm and psychological trauma." Ibid.

A-0054-19

A person violates N.J.S.A. 2C:33-4(a),[2] "if, with purpose to harass another, he: . . . [m]akes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm . . . ." Subsection (a) "targets a single communication." State v. Hoffman, 149 N.J. 564, 580 (1997). To prove a predicate act of harassment pursuant to subsection (a), a plaintiff may rely on proof of a single communication, "as long as defendant's purpose in making it . . . was to harass and as long as it was made in a manner likely to cause annoyance or alarm to the intended recipient." J.D. v. M.D.F., 207 N.J. 458, 477 (2011). "[A]nnoyance" under subsection (a) "means to disturb, irritate, or bother." Hoffman, 149 N.J. at 580. "[T]he annoyance or alarm required by subsection (a) need not be serious," but the communication at issue must be made with "a purpose to harass." Id. at 581-82.

A "purpose to harass may be inferred from the evidence presented," and "[c]ommon sense and experience may inform that determination." Id. at 577;

---

[2] We quote from N.J.S.A. 2C:33-4(a) because the predicate act found by the trial judge was harassment pursuant to that statute. In his counseled brief, defendant makes arguments based on N.J.S.A. 2C:12-1 (assault), 2C:12-3 (terroristic threats), and 2C:14-16 (nonconsensual sexual contact). Those arguments are not applicable because plaintiff did not allege – and the trial judge accordingly made no findings of – assault, terroristic threats, or nonconsensual sexual contact.

see also J.D., 207 N.J. at 477. "In determining whether a defendant's conduct is likely to cause the required annoyance or alarm to the victim, that defendant's past conduct toward the victim and the relationship's history must be taken into account." Hoffman, 149 N.J. at 585; see also H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003) (The "parties' past history, when properly presented, helps to inform the court regarding defendant's purpose [and] motive"). A trial judge "can consider evidence of a defendant's prior abusive acts regardless of whether those acts have been the subject of a domestic violence adjudication." Cesare, 154 N.J. at 405.

With that legal framework in mind, we consider first defendant's second argument about the admissibility of plaintiff's testimony concerning prior acts of domestic violence. The express language of the PDVA defeats that argument. As we held in R.G. v. R.G., the PDVA "permits consideration of '[t]he previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse.'" 449 N.J. Super. 208, 220 (App. Div. 2017) (quoting N.J.S.A. 2C:25-29(a)(1)). The testimony considered by the trial judge was limited to incidents of domestic violence between plaintiff and defendant. Moreover, because the trial judge also limited plaintiff's prior-incident testimony to the events alleged in her amended complaint, defendant

was "afforded an adequate opportunity to be apprised of those allegations and to prepare."  J.D., 207 N.J. at 480.  Accordingly, plaintiff's prior-incident testimony was admissible.

Defendant's first argument is also without merit.  Faulting the trial judge's credibility determinations, defendant complains he was not given a full opportunity to challenge plaintiff's testimony.  The record reveals otherwise. Judge Remson permitted him to cross-examine plaintiff and to testify directly. Considering the testimony of both witnesses, Judge Remson found plaintiff to be the more credible witness both as to the events of July 2 and as to prior domestic-violence incidents.  Her credibility findings are entitled to our deference.

To determine, as she had to, the purpose of and motive behind defendant's July 2 statement "you're provoking me and we both know what happens when you provoke me," Judge Remson appropriately considered evidence of prior domestic-violence incidents.  Plaintiff's credible testimony of an "extensive prior history of domestic abuse" supported Judge Remson's findings that plaintiff "interpreted [defendant's] statement as a threat to assault her" and defendant intended to "threaten exactly that, and cause alarm to plaintiff, in violation of N.J.S.A. 2C:33-4(a)."  Judge Remson then considered the parties'

A-0054-19

previous history of domestic violence, <u>see</u> <u>Silver</u>, 387 N.J. Super. at 128, and their testimony concerning the predicate act of harassment, which included plaintiff's testimony that she believed defendant had threatened her with bodily injury. Based on that credible evidence, Judge Remson concluded an FRO was necessary to protect plaintiff from "imminent harm and further acts of domestic violence." We see no basis to disturb that finding.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0054-19