# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0612-24

E.L.,[1]

    Plaintiff-Respondent,

v.

J.V.,

    Defendant-Appellant.

_____

        Argued March 12, 2026 – Decided April 6, 2026

        Before Judges Marczyk and Puglisi.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FV-16-2717-24.

        Adamo Ferreira (Adamo Ferreira, LLC) argued the cause for appellant.

        Ana Maria Meizys argued the cause for respondent.

PER CURIAM

---

[1] We use initials to protect the identities of the parties. R. 1:38-3(d)(10).

Defendant J.V. appeals from the trial court's October 3, 2024 final protective order (FPO) entered against him and in favor of plaintiff E.L. under the Victim's Assistance and Survivor Protection Act (VASPA), N.J.S.A. 2C:14-13 to -21. We affirm.

I.

Plaintiff was defendant's tenant from August 2019, when defendant became the owner of plaintiff's residence, to May 2024, at which time defendant's daughter became the owner of the property. Plaintiff has resided at the property at issue for over twenty-one years.

Plaintiff filed a VASPA complaint and was granted a temporary protective order (TPO) against defendant on June 27, 2024. In her complaint, she alleged defendant committed the predicate acts of lewdness, cyber-harassment, and stalking. Specifically, plaintiff claimed defendant repeatedly waited for her outside her home and followed her by car, approximately two times per week since January 2024, and more frequently prior to 2024. She asserted that on April 11, 2024, defendant waited for her outside her door, uninvited, and attempted to grab her by the shoulders when she walked out. Plaintiff also claimed defendant contacted her from unknown numbers four times and threatened her father and the father of her children. She alleged that

on January 8, 2024, defendant texted her he "wanted to be with" her and "bought the home because [plaintiff] came with it." Plaintiff further asserted defendant told her if she did not consent to sex with him he "would do it his way and . . . would not keep his desire to do it within himself." She also claimed that on January 18, 2024, defendant texted her he was revoking her ability to use the yard because she refused to have sex with him. He also told her he "would do it 'the hard way'" if she refused, which she interpreted to mean he would sexually assault her. Plaintiff alleged defendant caused her fear over the prior three years, since he became owner of her building.

The FPO hearing took place over three dates between July and October 2024. Plaintiff was self-represented, and defendant was represented by counsel. The court began by questioning plaintiff, during which she recounted her experiences with defendant, explaining since 2021, he had followed her nearly "all time time[,] every day," but beginning in January 2024, he had done so only about twice per week. She further explained she filed police reports prior to January 2024 but did not include those in her VASPA complaint, as they preceded VASPA's enactment. Plaintiff also stated she blocked defendant's phone number because of the inappropriate and sexual messages he would leave her.

Plaintiff testified that on January 8, 2024, she received a text message from an unfamiliar number, in which the sender identified themself as defendant. The message asked plaintiff to open the door and said, "it was only going to be a little while." Plaintiff explained she did not respond to the message because it was not sent from defendant's regular phone number, which she had already blocked. Despite her lack of response, plaintiff explained defendant nevertheless came to her home that same day and asked her to open the door.

Plaintiff also testified she received additional text messages on January 18, 2024, from that same number. She provided the court with copies of those text messages, which were written in Spanish, and presented an uncertified English translation of them. Defendant's counsel objected, arguing plaintiff's exhibits did not indicate the sender's phone number, and thus, the message might have come from someone other than defendant. The court questioned plaintiff concerning the authenticity of the first message and found it to be from defendant because he "identifie[d] himself as [defendant], the owner of the house that she lives in."

Defendant's counsel thereafter requested the court interpreter to translate the text messages written in Spanish into the record. The court then further

4

asked plaintiff how she knew defendant sent the January 18, 2024 text messages. Plaintiff responded she knew because the sender described what defendant "proposed" to do in the past, "what [defendant] ha[d] done[,] and what [defendant is] doing." Defendant's counsel objected on the grounds of improper speculation. After examining the same messages on plaintiff's phone and determining they matched the printed copies, the court allowed the interpreter to read the following text messages into the record:

> INTERPRETER: [Number one.] Ma'am, I am [defendant], the owner of the house. I need you to open the door. We have to talk only. Let me see you for a little while, please. Only a few minutes.
>
> . . . .
>
> INTERPRETER: Number two[.] Good morning, I only want to see you. Let me in and no one will find out. I give you my word about the [c]ourt, everything, that can end if you want. I can give you everything that you want and for you I would give everything. You know how many women would like to go around with me without even thinking about it? I promise you. I would not take pictures of you anymore. Please understand, don't be afraid. I am [defendant], I know that I made you go through a lot in court and in the yard, . . . and with the tenants from the second floor, but baby, . . . only you can stop it, if you make the right decision to go around with me and be my . . . woman. I would give you everything. You will never lack anything. . . . [Y]ou're looking at everything that you went through with your ex-partner and also because he was in . . . jail and what he did with you, I

know everything, or do you want me to do the same he did to you?  Educate me.  I am offering you Heaven, but I see that you like to live in hell.  But it will be the way you want . . . .  If you like it that way, that['s the] way it's going to be, but with the desire that I have for you to make you my woman and then you reject me like that.

Number three.  I think without your authorization it would be better.  Do you know how many times and years I have been waiting so that I can have you?  And I am going to do it, you know?  In reality, I never wanted the house.  I wanted [the house] because you live in it.  If you notice, I already took everyone out except you.  And amongst the tenants of the second floor, it was you because I never wanted to make . . . an agreement, only with my wife[,] and I couldn't see you any[more], forever, when I go in, [it] is to go and see you.  And the thing about the inspectors, I don't have a problem.  Look, they didn't do anything with me already.  No tickets.  I have . . . paid no tickets.  They are not going to do anything.  If you notice, no one has [done] anything.  I can change the lease when I want to.  I don't want to scare you.  I only want to enjoy [you.] . . .  I want to do[] Kama Sutra with you. . . .

. . . .

Number four.  It's only a warning.  Don't you ever dare to do anything against me with the[se] messages, because no one is going to believe you, not even the [j]udge, and I will tell you . . . because number one, it's not even my number; number two, they will all take what you are doing like it's because I wanted to evict you.  Number three, I don't think you want to speak or expose yourself in front of the whole world in court to explain what I wrote to you[,] and

A-0612-24

remember what they already did with you[,] and [if] the neighbors . . . found out . . . they would support me. . . . [T]hey already have . . . their opinion of you, so everyone will know what it is. Kisses.

The text messages were subsequently admitted into evidence without objection. Plaintiff explained she did not initially report those text messages to the police because of defendant's threats, but she later did so in February 2024. The police report was moved into evidence without any objection.

Defendant denied sending plaintiff the text messages that were read into the record. He offered phone records, which he argued demonstrated the calls and texts to plaintiff did not come from his phone number, as well as travel documents indicating he was in Colombia during the time those messages were sent, which he claimed precluded him from sending the messages. At the court's direction, plaintiff unblocked defendant's known phone number, and defendant called plaintiff's phone. The call appeared on plaintiff's phone as originating from defendant's known number, not the number associated with the disputed text messages.

Plaintiff next testified about an incident on April 11, 2024, in which defendant stood outside her apartment door and, upon her exit, attempted to grab her by the arms and hug her. She recounted she responded by pushing defendant away, telling him to "leave [her] in peace," running back inside, and

7

closing the door. She claimed defendant then stated "he was the owner" of her home, and "[she] had to do whatever he said." Plaintiff recalled defendant was still standing outside her home approximately two minutes later, when she again exited after her taxi arrived. At this point, she took a picture of him, which the court admitted into evidence without objection. She explained that encounter left her "very scared," noting it caused her to suffer a panic attack for which she had to take medication "to calm down." When defendant was asked why he appeared to be covering himself in the proffered picture, the court interpreted his response to mean he "just does that whenever."

On direct examination, defendant admitted to being outside plaintiff's home on April 11, 2024, and explained he was standing in front of a van belonging to one of his customers. Upon being asked by the court to explain why he was there, defendant testified he was there to talk to plaintiff regarding repairs "because she never answers." Defendant also testified it was a coincidence he had been parked in front of plaintiff's home when she came out on that date.

Plaintiff further testified regarding an incident on June 13, 2024, in which defendant followed her, in a car that was not his, when she left her home. Plaintiff alleged defendant regularly switched cars and followed her.

8

She explained defendant followed her from one car length away, while she was walking for two blocks until she got into a taxi, adding the encounter made her feel "terrorized." Plaintiff stated she took a picture of defendant as she was coming out of her apartment, which the court admitted into evidence. However, defendant denied plaintiff's photo depicted him and stated he did not recall being in the pictured vehicle on that date.

At various points throughout the proceedings, both parties also testified regarding their adversarial landlord-tenant relationship, including disputes about repairs and rental payments. Defendant testified his arguments with plaintiff escalated to the point where his wife prohibited him from talking to plaintiff and insisted on being the one to communicate with her thereafter. Plaintiff testified, although she was served with an eviction notice in 2024, she never received any notice from defendant regarding his sale of the house to his daughter or of her need to vacate the home. She also asserted she never received notice repairs needed to be made to her home, and she never prohibited defendant or others from making repairs. Defendant testified as to plaintiff's failure to pay rent in 2021, a subsequent unsuccessful eviction proceeding, and the sale of the property to his daughter in May 2024, after which he ceased being plaintiff's landlord.

9

Following the parties' testimony, the trial court rendered an oral decision. It found plaintiff to be "completely credible," observing her testimony was "consistent, despite repeated attempts and cross[-]examination to expose contradictory statements," along with her "emotional" demeanor and refusal to look at defendant. The court noted it only considered the police report as corroborative evidence regarding plaintiff's credibility, establishing "she did, in fact, go to the police at some point because she was alarmed . . . about [the] January 8[] and . . . 18[] messages." Regarding the April 11, 2024 incident, it stated it "believe[d] plaintiff . . . [that] defendant was outside . . . for no reason[] other than to confront, see, talk [to], bother, [or] communicate with her." The court also noted it believed plaintiff regarding the June 13 incident, that defendant followed her in his vehicle until she got into a taxi.

In contrast, the court found defendant's testimony to be less credible, noting it did not believe his assertion it was a coincidence he was parked outside plaintiff's home on April 11, 2024, because plaintiff went in and out of the building twice, or that he "just happened to want to put his hood up at th[e] precise moment when a picture was being taken" of him. However, it did believe defendant's testimony he was not able to communicate with plaintiff because she was ignoring him, reasoning plaintiff explained she was afraid of

10

him. It also did not find credible defendant's denial of sending plaintiff the disputed text messages, reasoning the content included self-identification and contained knowledge of details only defendant would have known. The court noted "defendant had the means to create another . . . phone number, because he told [plaintiff] that's what he was going to do." It also found defendant being in Colombia at the time the text messages were sent was not "a bar" to him sending them.

The court concluded plaintiff demonstrated, by a preponderance of the evidence, defendant committed the predicate act of stalking, but not lewdness or cyber-harassment. Regarding its stalking finding, it found defendant engaged in a "course of conduct" that included "follow[ing] her, monitor[ing] her, [and] communicat[ing] with her . . . on at least two occasions, if not more." It also referenced the power dynamic between the parties, noting their landlord-tenant relationship. Specifically, the court found it "reasonable" for plaintiff to be scared of defendant, given her testimony of her fear and her demeanor in court, noting plaintiff was "very vulnerable because she's a tenant who had been threatened with eviction," and defendant told her he would stop the court proceedings if she gave him what he wanted and slept with him. The court further explained there was "evidence of coercion and control" in the text

11

messages defendant sent plaintiff, reasoning he told plaintiff she can only stop the eviction proceedings if she slept with him and that "no one would believe her."

The court ultimately found plaintiff needed the protection of an FPO to prevent further "stalking, control[,] and harassment by . . . defendant [and] so she can live in peace." It analyzed plaintiff's need for protection under prong two of Silver v. Silver,[2] finding an extensive history between the parties. However, it noted it was limiting its findings to the allegations in plaintiff's complaint. As to those allegations, the court found "a pattern of coercive control by . . . defendant [who was] in [a] superior position . . . [a]s a landlord in control of [the] property, which was also referenced obliquely in his text [from] January 18." See 387 N.J. Super. at 120.

Accordingly, the court entered an FPO against defendant and in favor of plaintiff, which included terms allowing defendant to access his nearby business.

## II.

Defendant argues the trial court erred in finding the predicate act of stalking and in granting an FPO because it failed to consider N.J.S.A. 2C:14-

---

[2] 387 N.J. Super. 112 (App. Div. 2006).

12

16(a)(2). He also contends the court's findings of fact were not based on adequate, substantial, or credible evidence. He next asserts the court erred by admitting and considering improper evidence and failed to consider proper evidence. He further maintains the court erred by failing to preserve evidence for appeal. Lastly, he contends the trial court improperly acted as an advocate on behalf of plaintiff during the trial.

In VASPA cases, "[w]e defer to a trial court's factual findings 'when supported by adequate, substantial, credible evidence.'" C.R. v. M.T., 257 N.J. 126, 139 (2024) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). Our "deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Ibid. (quoting MacKinnon v. MacKinnon, 191 N.J. 240, 254 (2007)). Thus, we shall not disturb a trial court's factual findings "unless they 'went so wide of the mark that a mistake must have been made.'" Ibid. (quoting MacKinnon, 191 N.J. at 254). However, we review questions of statutory interpretation de novo. Ibid.

VASPA, in pertinent part, provides:

> Any person alleging to be a victim of nonconsensual sexual contact, sexual penetration, or lewdness, or any attempt at such conduct, or stalking or cyber-harassment, and who is not eligible for a restraining order as a "victim of domestic violence" as defined by . . . [the Prevention of Domestic Violence Act

13

(PDVA), N.J.S.A. 2C:25-17 to -35], may, except as provided in subsection b. of this section,[3] file an application with the Superior Court pursuant to the Rules of Court alleging the commission of such conduct or attempted conduct and seeking a [TPO].

[N.J.S.A. 2C:14-14(a)(1).]

The statute was adopted to authorize courts "to issue protective orders for persons victimized by acts of stalking . . . in situations for which the domestic violence statutes are inapplicable because the victim lacks a prior or existing spousal, household, or dating relationship, or . . . [a] child in common[] with the offender."[4] Assemb. Health Comm. Statement to S. 1517, at 1 (Mar. 20, 2023) (L. 2023, c. 127).

At an FPO hearing:

---

[3] Subsection b. addresses "nonconsensual sexual contact, sexual penetration, or lewdness, or any attempt at such conduct, or stalking or cyber-harassment has been committed by an unemancipated minor" or "committed against an unemancipated minor by a parent, guardian, or other person having care, custody[,] and control of that child" and provides alternative avenues to seek redress.

[4] VASPA replaced and expanded the scope of protections afforded under the Sexual Assault Survivor Protection Act, which provided protection for persons not eligible under the PDVA but was limited to "acts of nonconsensual sexual contact, sexual penetration, or lewdness, or attempts thereof, committed against" a victim. Assemb. Health Comm. Statement to S. 1517, at 1 (Mar. 20, 2023) (L. 2023, c. 127).

[T]he standard for proving the allegations made in the application for a protective order shall be a preponderance of the evidence. The court shall consider but not be limited to the following factors:

> (1) the occurrence of one or more acts of nonconsensual sexual contact, sexual penetration, or lewdness, or any attempt at such conduct, or acts of stalking or cyber-harassment against the alleged victim; and

> (2) the possibility of future risk to the safety or well-being of the alleged victim.

[N.J.S.A. 2C:14-16(a).]

A court may not deny an FPO due to an "alleged victim's failure to report the incident to law enforcement." N.J.S.A. 2C:14-16(b).

We review a "trial court's evidentiary rulings . . . 'under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion.'" State v. Prall, 231 N.J. 567, 580 (2018) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)).

An abuse of discretion occurs when a trial court's decision "was not premised upon consideration of all relevant factors, was based upon consideration of irrelevant or inappropriate factors, or amounts to a clear error in judgment." Masone v. Levine, 382 N.J. Super. 181, 193 (App. Div. 2005).

An improper evidentiary ruling will call for reversal if it "is 'so wide of the mark' that it constitutes 'a clear error in judgment,'" State v. Garcia, 245 N.J. 412, 430 (2021) (citing State v. Medina, 242 N.J. 397, 412 (2020)), such that it is "clearly capable of producing an unjust result." Manata v. Pereira, 436 N.J. Super. 330, 349 (App. Div. 2014) (quoting R. 2:10-2).

When no objection is made to the admission of evidence, but it is challenged on appeal, the plain error standard applies. See R. 2:10-2; State v. Santamaria, 236 N.J. 390, 405 (2019). Plain error is a "high bar" to clear. Santamaria, 236 N.J. at 404. "[T]he error will be disregarded unless a reasonable doubt has been raised whether the jury came to a result that it otherwise might not have reached." State v. Singh, 245 N.J. 1, 13 (2021) (quoting State v. R.K., 220 N.J. 444, 456 (2015)). In civil cases, relief under the plain error rule "is discretionary and 'should be sparingly employed.'" Cavuoti v. N.J. Transit Corp., 161 N.J. 107, 129 (1999) (quoting Ford v. Reichert, 23 N.J. 429, 435 (1957)); see also Bldg. Materials Corp. of Am. v. Allstate Ins. Co., 424 N.J. Super. 448, 487 n.14, (App. Div. 2012).

A.

Defendant asserts the trial court erred in finding he committed the predicate act of stalking because plaintiff did not establish he "purposefully or

knowingly" engaged in a course of conduct that would cause a reasonable person to fear for their safety or suffer other emotional distress. He notes the trial court found he stalked plaintiff based on two text messages he was alleged to have sent to plaintiff from an unknown phone number, which he avers was not associated with him, and because he was outside plaintiff's home on two occasions. Defendant argues the court's findings, however, failed to account for the fact he owns three properties adjacent to plaintiff's rental unit, including one in which his daughter and grandchild reside, and that he works directly across the street from plaintiff's rental unit as a mechanic, which requires him to park and test vehicles on the street at issue. Thus, he contends the court erred in finding he repeatedly monitored or followed plaintiff or had an unlawful purpose for being near plaintiff's home, claiming it was "natural" for the parties to cross paths as neighbors and because of their landlord-tenant relationship.

Defendant contends the trial court also failed to analyze whether a reasonable person in plaintiff's situation would fear for their safety, claiming it would not have found so if it had conducted such an analysis. Specifically, he claims the court did not compare plaintiff's subjective feelings to that of an ordinary, reasonable person. Defendant insists the trial court should have

17

A-0612-24

inquired whether a reasonable person would have been under emotional distress if confronted by their landlord who ran a business on the same block.

VASPA permits "[a]ny person alleging to be a victim of . . . stalking[,] . . . who is not eligible for a restraining order" under the PDVA, to seek a protective order. N.J.S.A. 2C:14-14(a)(1). VASPA defines stalking as:

> [P]urposefully or knowingly engaging in a course of conduct directed at or toward a person that would cause a reasonable person to fear for the reasonable person's own safety[,] . . . or suffer other emotional distress, because the conduct involves: repeatedly maintaining a visual or physical proximity to a person; directly, indirectly, or through third parties, by any action, method, device, or means, following, monitoring, observing, surveilling, threatening, or communicating to or about a person, or interfering with a person's property; repeatedly committing harassment against a person; or repeatedly conveying, or causing to be conveyed, verbal or written threats or threats conveyed by any other means of communication or threats implied by conduct or a combination thereof directed at or towards a person.
>
> [Ibid.]

It further defines "repeatedly" as "on two or more occasions." Ibid.

Here, the trial court did not err in finding plaintiff proved, by a preponderance of the evidence, defendant committed the predicate act of stalking. It found, based on the parties' testimony and evidence, defendant engaged in a "course of conduct," including following, monitoring, and

18

communicating with plaintiff on at least two occasions, if not more. The court credited plaintiff's "consistent" testimony regarding defendant repeatedly waiting for her outside her home, sending her threatening text messages, and following her at least twice, finding plaintiff "completely credible" and noting her fearful, emotional demeanor. Contrary to defendant's assertion, it also clearly considered the fact defendant works close to plaintiff's home in finding it was not a coincidence he was parked outside plaintiff's home on April 11, 2024, and in including terms in the FPO that allowed defendant to access his nearby business. Accordingly, its findings clearly established defendant acted "purposefully or knowingly" in engaging in a "course of conduct." See N.J.S.A. 2C:14-14(a)(1).

The court also clearly analyzed whether a reasonable person in plaintiff's situation would fear for their safety, finding plaintiff's fear was reasonable, given the coercion and control asserted by defendant, including his threats to evict her and his efforts to coerce her into a relationship as a condition of avoiding legal or housing consequences. See N.J.S.A. 2C:14-14(a)(1). Accordingly, we determine there is no basis to disturb the court's conclusion defendant committed the predicate act of stalking.

B.

Defendant next contends, even if the trial court correctly determined he committed the predicate act of stalking, it erred in its analysis of whether a future risk to plaintiff's safety or well-being existed by analyzing the matter under the PDVA and applying Silver, 387 N.J. Super 112, instead of VASPA. He notes VASPA mandates the consideration of "the possibility of future risk" to the safety or the "well-being" of the alleged victim under N.J.S.A. 2C:14-16(a)(2) and asserts the court failed to consider this factor by improperly conducting its analysis under the PDVA and the second prong of Silver.

Under VASPA, courts must consider "the possibility of future risk to the safety or well-being of the alleged victim" in determining whether to grant an FPO. N.J.S.A. 2C:14-16(a)(2). In C.R., our Supreme Court held the plain language of this factor "creates a standard that is permissive and easily satisfied." 257 N.J. at 132. There, the Court found the plaintiff demonstrated a possibility of future risk to her safety or well-being based on her credible testimony "a sexual assault 'destroyed' her, she was intensely traumatized, and . . . was 'terrified' for her safety." Ibid. It also noted "[a] 'possibility of future risk' is less demanding than 'necessary' protection," as required under prong two of Silver. Id. at 146; see also Silver, 387 N.J. Super. at 127.

A-0612-24

Here, the trial court adequately addressed "the possibility of future risk" to plaintiff's "safety or well-being," despite structuring its analysis under prong two of Silver and concluding plaintiff "need[ed] the protection of th[e FPO] to prevent any more stalking, control[,] and harassment by . . . defendant." It clearly found "a pattern of coercive control by . . . defendant in his superior position . . . [a]s a landlord in control of [the] property." While the court referenced the more demanding Silver framework, its findings nevertheless satisfy the "permissive and easily satisfied" standard of N.J.S.A. 2C:14-16(a)(2). See C.R., 257 N.J. at 132, 146. Accordingly, the court did not err in granting plaintiff the FPO by failing to consider N.J.S.A. 2C:14-16(a)(2).

C.

Defendant also argues the trial court's credibility determinations were "manifestly unsupported" by the competent, relevant, and credible evidence in the record and asserts it substituted credibility determinations for objective evidential facts. Specifically, he asserts the court improperly relied on credibility determinations regarding key evidence, including text messages he was alleged to have sent to plaintiff, which he contends were not proven to be from any phone number associated with him and were fabricated by plaintiff. He highlights the phone records he presented did not match the phone number

21

A-0612-24

from which the text messages at issue were sent. Regarding the January 18, 2024 text messages, defendant contends he was out of the country and not available to enter the rental unit. He asserts the trial court should have required plaintiff to present additional evidence to conclude he sent those messages. Defendant further contends plaintiff's failure to block the phone number associated with the January 2024 text messages is inconsistent with the court's finding plaintiff was in fear of defendant stalking or harassing her.

Here, the trial court's factual findings were supported by adequate, substantial, credible evidence in the record. It found plaintiff's testimony "completely credible," noting her consistent accounts of defendant's repeated harassment and her emotional demeanor during the proceedings. Additionally, in finding defendant sent plaintiff the proffered text messages, it reviewed the messages on her phone, which the court observed contained self-identifying information and details only defendant would know, and had the texts read into the record by an interpreter at defense counsel's request and with no objection to their admission. The court also specifically rejected defendant's argument he could not have sent the messages and found he had the means to create another phone number. We therefore conclude there is no basis to determine

22

the court's findings were manifestly unsupported by the record. Thus, there we discern no reason to disturb the court's credibility determinations.

D.

Defendant further claims the trial court erred in admitting improper evidence and by failing to preserve evidence for appeal. Specifically, he contends it erred in admitting purported text messages from him written in Spanish without a certified translation and without the entirety of the conversation, contrary to Standard 4.4 of the New Jersey Judiciary Language Access Plan (LAP), citing Administrative Directive #01-17, "New Jersey Judiciary Language Access Plan" (Jan. 10, 2017).

Defendant also claims he was improperly denied the chance to examine plaintiff's cell phone to verify the text messages at issue were still on her phone and the completeness of the messages. Rather, he asserts the trial court determined the proffered messages were identical to the ones on plaintiff's phone, despite not knowing Spanish. Defendant avers he was forced to accept the court's conclusion regarding the text messages without independent examination, as the court did not copy or otherwise preserve plaintiff's cell phone for appellate review through copying or photographing the messages. Citing L.M.F. v. J.A.F. for the proposition evidence can be preserved in

23

tangible form as part of the record, including by printing out electronic evidence for trial, he asserts the trial court failed to preserve evidence for appeal that would have allowed him to prove the number in plaintiff's cell phone was not his. See 421 N.J. Super. 523, 527 n.2 (App. Div. 2011).

Defendant also asserts the court failed to draw a negative inference from plaintiff's delay in reporting the alleged events and instead excused the delay based on "manufactured reasons not testified to by . . . [p]laintiff," including "fear, language barriers, lack of transportation, [and] confusion as to the legal system on the cycle of domestic violence." He notes plaintiff's exhibits were consistently identified throughout trial and entered into evidence, whereas none of his own were.

Section 4.4 of the LAP states "[u]nless otherwise permitted by the court, all evidentiary documents are to be presented in English and all non-English documents intended to be introduced into evidence must be accompanied by a Statement/Certificate of translation." Administrative Directive #21-23, "Updated New Jersey Judiciary Language Access Plan" (Nov. 14, 2023).[5] However, Section 4.4's "Best Practices" also provides:

> [I]n certain circumstances a judge may need to assess
> a recording or electronic message in a language other

---

[5] Defendant relied on an earlier version of the LAP.

than English without the benefit of prior transcription and translation. For example, in an emergent domestic violence hearing, where pretrial discovery is not permitted unless good cause is shown, the judge will generally not require the victim to provide a transcript and translation of a cell phone recording. Instead, <u>the judge may seek to have a court interpreter interpret the recording or electronic message during the hearing</u>. However, for reasons identified below, providing accurate interpretation of recordings or messages, in any language, may be difficult or impossible, and legal and operational concerns may arise. If the file is short and clear enough, the interpreter may be able to render an interpretation if safeguards as described below are taken.

[(Emphasis added).]

Here, the court complied with the LAP in allowing the court interpreter to translate and read the substance of the text messages into the record pursuant to defense counsel's request. Section 4.1.1 of the LAP allows the translations of "short and simple documents." Plaintiff also took steps to comply with the LAP by providing a translated copy, albeit not certified, and the court took steps to verify the proffered text message exhibits matched the messages in plaintiff's phone. Thus, the court did not err in admitting the text messages into evidence.

Additionally, contrary to defendant's contention, the trial court did not err in failing to draw a negative inference from plaintiff's delay in reporting the

alleged events, given VASPA prohibits courts from denying FPOs due to an applicant's "failure to report the incident to law enforcement." N.J.S.A. 2C:14-16(b).

Further, defendant did not raise before the trial court the issue regarding the court's failure to preserve evidence by copying the messages from plaintiff's phone or otherwise preserving the evidence. "Generally, an appellate court will not consider issues, even constitutional ones, which were not raised [before the trial court]." State v. Galicia, 210 N.J. 364, 383 (2012). Appellate courts do not "consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available 'unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'" Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) (quoting Reynolds Offset Co. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959)). This matter involves neither an issue regarding jurisdiction nor a matter of great public importance warranting departure from this general rule. Nevertheless, copies of the text messages were entered into evidence and preserved, and the court viewed plaintiff's phone and confirmed they matched the exhibits moved into evidence. Additionally, defense counsel

did not object to the introduction of the subject text messages or request they be preserved in some other manner. We therefore find no error.

E.

Lastly, defendant argues the trial court "crossed the boundary" from impartiality into advocacy in the manner it conducted the FPO hearing, particularly in commencing the trial by conducting a direct examination of plaintiff, assisting her in presenting her case by leading her through a series of questions, and by helping her authenticate and admit evidence. He asserts the court prompted plaintiff or "outright le[]d" her when her testimony failed to match the complaint or establish evidence satisfying the VASPA statute. Defendant contends the court did not similarly assist him in any regard and did not admit any of his exhibits into evidence. He further claims the court argued in plaintiff's favor when an objection was made, without her participation.

"[A] trial judge must take special care to craft questions in such a manner to avoid being perceived as an advocate for any side of a dispute." L.M.F., 421 N.J. Super. at 537. However, this concern is "less acute in the context of bench trials, where judges serve as fact finders and have more latitude in questioning witnesses." State v. Taffaro, 195 N.J. 442, 451 (2008). In a bench trial, a judge may examine witnesses to clarify testimony, aid the

A-0612-24

court's understanding, elicit material facts, and assure the efficient conduct of the trial. See State v. Medina, 349 N.J. Super. 108, 131 (App. Div. 2002); N.J.R.E. 614. In the context of domestic violence trials, especially with pro se litigants, a court's questioning of witnesses should be done in an "orderly and predictable fashion . . . and not at the expense of the parties' due process rights." Franklin v. Sloskey, 385 N.J. Super. 534, 543 (App. Div. 2006).

Here, the trial court elicited testimony about the allegations contained in plaintiff's complaint by questioning plaintiff. Notably, only plaintiff was self-represented and defendant, through counsel, identified exhibits and made objections, many of which were sustained. While defendant contends "[t]he entire trial [wa]s riddled with questions and comments" showing the court was "too helpful" to plaintiff and "not helpful" to him, he fails to point to any significant questions or comments to support his contention. Although the court may have clarified plaintiff's statements in response to defense counsel's objections, the record shows it also sustained many of defendant's objections and limited plaintiff's testimony and thus did not improperly lead her to favorable testimony.

As to defendant's assertion the court "did not assist [him] in any regard and did not admit any of [his] exhibits into evidence," the court allowed him to

28

present his phone records and flight information in arguing he did not send the January 2024 text messages to plaintiff and made findings regarding both exhibits in its decision, but defense counsel never moved for those exhibits to be admitted into evidence. In contrast, the court did not admit all of plaintiff's proffered exhibits, such as a photo from her security camera and video evidence, sustained defense counsel's objections due to authentication issues and a lack of relevance, and restricted the use of plaintiff's police report to corroborate her credibility. It also ensured the FPO would not prohibit defendant from accessing his nearby business. Thus, the trial court did not cross the "line that separates advocacy from impartiality," see Taffaro, 195 N.J. at 451, or deny defendant due process in examining plaintiff, see Franklin, 385 N.J. Super. at 543.

In conclusion, we affirm the October 3, 2024 FPO because: the trial court's findings were supported by adequate, substantial, and credible evidence in the record; the court properly applied the governing VASPA statute and standards; it did not abuse its discretion in its evidentiary rulings or in the conduct of the trial; and the court sufficiently considered both the predicate act of stalking and the possibility of future risk to plaintiff's safety.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

29

A-0612-24